OPINION *Page 2 
{¶ 1} Defendant-appellant William Haschenburger appeals from his conviction and sentence entered for rape, a violation of R.C.2907.02(A)(2), in the Mahoning County Common Pleas Court. Numerous issues are raised in this appeal. The first issue deals with the testimony of an expert witness and whether that testimony amounts to an opinion regarding the veracity of the victim. The second issue is whether the trial court's instruction on force was erroneous. The third and fourth issues are sufficiency of the evidence and manifest weight of the evidence arguments. The fifth issue is whether trial counsel was ineffective. The sixth issue is whether a lay witness bolstered the credibility of the victim. The seventh issue is whether the indictment was sufficiently specific. The final issue is a sentencing issue related to State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856. For the reasons stated below, nine of the rape convictions are affirmed, however, the tenth conviction is reversed for lack of sufficient evidence of force. Thus, the sentence for that conviction is vacated. The sentences for the remaining nine convictions are also vacated. However, they are additionally remanded for resentencing pursuant to Foster.
STATEMENT OF FACTS {¶ 2} When D.M., the victim, was 13 years old, William Haschenburger French kissed her. (Tr. 304-305). Haschenburger was close friends with D.M.'s father, Dennis. (Tr. 303). In fact, D.M. testified that she considered Haschenburger a part of the family. (Tr. 303). Haschenburger was also the uncle of D.M.'s best friend.
 {¶ 3} Shortly after she turned 14, other things began happening with Haschenburger. (Tr. 308). It started with digital penetration and then eventually led to vaginal sex, oral sex, and attempted anal sex. (Tr. 309, 311, 324). The majority of these acts occurred in the basement of her home when she was babysitting her little brother.
 {¶ 4} D.M. testified that Haschenburger made her e-mail/instant message him every night. (Tr. 311). Two e-mail messages were admitted into evidence. One is *Page 3 
dated July 30, 2000 and it is from D.M. to Haschenburger stating that she loves him. (Exhibit 25). The other one is dated September 21, 2000 from Haschenburger asking D.M. to marry him when she turns 18. This e-mail also contains a response from D.M. stating that she loves him and would marry him. (Exhibit 24). These e-mails occurred when she was 14 years old. (Tr. 321). She testified that she wrote these e-mails and others to Haschenburger because he made her "write him letters about talking of our love." (Tr. 321). She then stated at one point when she was younger she actually started to believe that she loved him. (Tr. 321).
 {¶ 5} D.M. further testified that Haschenburger was possessive; that he had to know where she was at all times. (Tr. 323). She stated that she was always afraid he would get mad and that she had seen him throw tantrums, which included throwing objects. (Tr. 309, 311, 340). When asked why she did not tell her parents about everything that was going on with Haschenburger, she stated:
 {¶ 6} "I was trained to believe it was my fault. And he often threatened to tell my parents. I believe that to be a legitimate threat." (Tr. 325).
 {¶ 7} The sexual activity with Haschenburger occurred until January 2003. One of the last times she had vaginal intercourse with him was in January 2003 after she turned 16 years old. (Tr. 332). She drove to his house and spent the night. (Tr. 330). She explained that he hid her car in the garage so no one would know she was there. (Tr. 330-331). She also explained that she lied to her parents and told them she was attending a sleep over. (Tr. 330-331). She stated that he was able to make her come and stay at his house by threatening to tell her parents about them. (Tr. 331).
 {¶ 8} D.M.'s first recounting of the rapes occurred to her then current boyfriend, John. This occurred between six months to a year after her last encounter with Haschenburger, so some time when she was 17. D.M. told John that she had been raped by Haschenburger. John eventually convinced her that her parents needed to know what happened to her. With her permission, John told her parents about the rape. This occurred when D.M. was approximately 18 years old. She then filed a police report, was examined by Dr. Dewar and gave a statement. *Page 4 
 {¶ 9} An indictment was then issued against Haschenburger. The indictment alleged 10 counts of rape in violation of R.C.2901.02(A)(2)(B). The case proceeded to a jury trial. The jury convicted Haschenburger of all counts. He was then sentenced to maximum consecutive sentences for a total sentence of 100 years. Haschenburger now timely appeals.
FIRST ASSIGNMENT OF ERROR {¶ 10} "THE TRIAL COURT ERRED IN PERMITTING THE TESTIMONY OF DR. DEWAR, A DIRECT VIOLATION OF STATE V. BOSTON (1989), 46 OHIO ST.3D 108."
 {¶ 11} Under this first assignment of error, Haschenburger argues that Dr. Dewar's testimony violated State v. Boston (1989), 46 Ohio St.3d 108
(overruled on other grounds) because the doctor rendered an opinion regarding the veracity of the victim's allegation of rape. In further support of this argument, he contends that Evid.R. 803(4) was violated because Dr. Dewar's examination of D.M. was not for medical diagnosis or treatment but was rather for the prosecution of Haschenburger.
 {¶ 12} In Boston, the Ohio Supreme Court stated the following:
 {¶ 13} "Dr. Asch testified that in her opinion, Cynthia had been sexually abused. She based her opinion on an internal medical examination of Cynthia, Cynthia's statements to her and the child's medical history. As part of her testimony, Dr. Asch stated that there was a probable vaginal penetration and a possible rectal penetration. The doctor testified that `probable' meant ninety-five to ninety-nine percent certainty while `possible' meant greater than fifty percent certainty. Our issue is whether testimony of an expert that a child was sexually abused will assist the trier of fact in understanding whether abuse has in fact occurred. See Evid.R. 702 and 704.
 {¶ 14} "Most jurors would not be aware, in their everyday experiences, of how sexually abused children might respond to abuse. Incest is prohibited in all or almost all cultures and the common experience of a juror may represent a less-than-adequate foundation for assessing whether a child has been sexually abused. See State v. Myers
(Minn. 1984), 359 N.W.2d 604, 609-610.
 {¶ 15} "Thus, it follows that an expert's opinion testimony on whether there was sexual abuse would aid jurors in making their decision and is, therefore, admissible *Page 5 
pursuant to Evid.R. 702 and 704. Dr. Asch's opinion testimony that Cynthia was sexually abused was properly admitted.
 {¶ 16} "* * *
 {¶ 17} "Dr. Asch was also allowed to express her opinion that Cynthia had not fantasized her abuse and that Cynthia had not been programmed to make accusations against her father. With this testimony, Dr. Asch, in effect, declared that Cynthia was truthful in her statements.
 {¶ 18} "We have little difficulty in finding that the admission of this testimony was not only improper — it was egregious, prejudicial and constitutes reversible error. In Eastham, supra, at 312, 530 N.E.2d at 414, Justice Brown, concurring, stated that such an opinion `* * * acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility. * * * In our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses.'
 {¶ 19} "We agree with this statement and hold that an expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant. We further find that it was error, and more than harmless, for the trial court to have permitted Dr. Asch to render an opinion on the veracity of Cynthia." Boston, 46 Ohio St.3d at 128-129.
 {¶ 20} Dr. Dewar's testimony in the matter at hand falls within the category of her opinion as to whether or not D.M. had been a victim of child sexual abuse. The doctor testified about her results of the medical exam she performed on D.M. She explained that the internal exam revealed that her hymen "was estrongenized and had a transaction at 7 o'clock." (Tr. 261). She explained that this meant that the hymen had been torn and had healed. She stated that the cause of the tear was blunt force penetrating trauma. (Tr. 261). She went on to explain that 65% of proven victims of child sexual abuse have no evidence of trauma. (Tr. 263). She then stated that the type of tear she saw on D.M. was not normal and that to a reasonable degree of medical certainty D.M. had been a victim of child sexual abuse. (Tr. 263). In stating the figures and conclusion, she explained that her information was based upon *Page 6 
published studies, specifically from author Joyce Adams, who by Dr. Dewar accounts is the most published author in this area. (Tr. 262).
 {¶ 21} Dr. Dewar also explained that she could not date the wound. (Tr. 262). Upon cross-examination when asked about the date of the injury, she stated that she could not say when it happened, where it happened or who it happened by. (Tr. 267).
 {¶ 22} The Boston decision clearly allows an expert to testify as to whether or not a person was a victim of child sexual abuse. However, the expert is not permitted to testify to the veracity of the victim.
 {¶ 23} Dr. Dewar's testimony complied with the Boston mandates. Dr. Dewar gave her expert opinion based on the medical exam that the victim was sexually abused. The testimony showed nothing more than that. Nowhere in the testimony did Dr. Dewar state that she believed D.M.'s accusation that Haschenburger sexually abused her. Dr. Dewar did not testify that she was a believable person; she gave no opinion of the victim's veracity.
 {¶ 24} Furthermore, the transcript indicates that Dr. Dewar's testimony does fall within the hearsay exception of Evid.R. 803(4). Evid.R. 803(4) provides an exception to the hearsay rule for "[statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment."
 {¶ 25} She was specifically asked whether the information she was provided with from D.M. was solely for the purposes of medical treatment and diagnosis. (Tr. 281). She indicated that it was. (Tr. 281). Furthermore, she testified that she works for the Child Advocacy Center, not a prosecutor's or investigator's office. (Tr. 269). The testimony also indicated that Dr. Dewar probably advised D.M. to seek counseling. (Tr. 278). Thus, considering all the above, this assignment of error has no merit.
SECOND ASSIGNMENT OF ERROR {¶ 26} "THE TRIAL COURT ERRED WHEN IT PROVIDED THE JURORS WITH THE WRONG DEFINITION OF `FORCE,' AN ESSENTIAL ELEMENT OF THE CRIME OF RAPE." *Page 7 
 {¶ 27} Under this assignment of error, Haschenburger argues that the trial court erred when it used the definition of force that was enumerated in State v. Eskridge (1988), 38 Ohio St.3d 56. According to Haschenburger, the Eskridge force definition is to be used in cases in which the victim is under 13 years of age.
 {¶ 28} Haschenburger's counsel raised the issue of age and force to the trial court but did not express a clear objection to the use of the force instruction. As there was no clear objection, Haschenburger admits that we must review this assignment under a plain error standard of review. The failure to object to a jury instruction constitutes a waiver and any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise. State v.Underwood (1983), 3 Ohio St.3d 12.
 {¶ 29} The jury instruction regarding force read as follows:
 {¶ 30} "Further, the state must prove that the defendant employed force in order to cause the victim to submit. Force means any violence or compulsion or constraint physically exerted by any means upon or against another person.
 {¶ 31} "When the relationship between the victim and the defendant is one of child and parent or any other parental or elder authority figure, like an uncle or grandparent or stepfather, et cetera, the element of force need not be openly displayed or physical. It can be subtle. It can be slight. It can be psychological. It can be emotionally powerful. Evidence of an expressed threat of harm or evidence of significant physical restraint is not required in that circumstance.
 {¶ 32} "If you find beyond a reasonable doubt that under the circumstances in evidence in this case that the victim's will was overcome by fear or by duress or by intimidation, then the element of force has been proved.
 {¶ 33} "A threat includes any direct threat or any indirect threat. Of course a direct threat is something someone says to another in a threatening way, and indirect is one that someone doesn't have to say; the victim just assumes from the conduct that a threat is made. The victim need not prove any physical resistance [sic] to the defendant." (Tr. 570-571).
 {¶ 34} Haschenburger is correct that the instruction given does contain a psychological force instruction as was defined inEskridge. *Page 8 
 {¶ 35} In Eskridge, a father had abused his four year old child. In order for the life specification to be found, the state was required to show that force had been present in the rape. The Eskridge court concluded that it was. The basis of its determination was that force does not need to be overt and physically brutal, but can be subtle and psychological. Id. at 58-59. It went on to explain that, "[t]he youth and vulnerability of children, coupled with the power inherent in a parent's position of authority creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose." It then stated that the perpetrator of the rape was the victim's father and as such, he held a position of authority over her which did not require any explicit threats or display of force. Id. at 59.
 {¶ 36} In 1998, the Ohio Supreme Court reviewed the Eskridge holding and added to it. State v. Dye, 82 Ohio St.3d 323, 1998-Ohio-234. InDye, the Ohio Supreme Court stated that the psychological force instruction can be used in cases other than those that involve parents raping their children. The psychological instruction would also apply in a situation where a person holds a position of authority over the child. However, in the syllabus, the Court specifically stated the following:
 {¶ 37} "A person in a position of authority over a child under thirteen may be convicted of rape of that child with force pursuant to R.C. 2907.02(A)(1)(b) and (B) without evidence of express threat of harm or evidence of significant physical restraint." 82 Ohio St.3d 323.
 {¶ 38} Haschenburger concentrates on the Court's use of the age 13 in the syllabus to argue that an Eskridge psychological force instruction cannot be used when the victim is 13 years or older.
 {¶ 39} The Eighth Appellate District has recently faced an argument similar to the above. State v. Milam, 8th Dist. No. 86268,2006-Ohio-4742 (appeal not accepted for review in 112 Ohio St.3d 1472). In Milam, the appellant wanted the court to apply the definition of force that was enumerated in State v. Schaim, 65 Ohio St.3d 51,1992-Ohio-31, which was an adult victim rape case:
 {¶ 40} "A defendant purposely compels another to submit to sexual conduct by force or threat of force if the defendant uses physical force against that person or *Page 9 
creates the belief that physical force will be used if the victim does not submit." Milam, 2006-Ohio-4742 at ¶ 10.
 {¶ 41} The Eighth Appellate Court declined to use that definition. In doing so, it first explained that Dye does not preclude anEskridge instruction when the victim is 13 years or older. It quoted the following excerpt from State v. Musgrave (Nov. 25, 1998), 9th Dist. No. 18260, to support its position.
 {¶ 42} "[T]he alleged victims — J.M. and M.P. — were thirteen years old at the time of the alleged incidents and, arguably, would not be covered by the specific holding in Dye. Based on the reasoning underlying that holding, however, this Court concludes that the element of force, even when the alleged victim is at least thirteen years old, may be proven by that same standard. What mattered in Dye was that the defendant occupied a position with respect to the child that allowed him to be able to exert force by subtle and psychological means: he was a trusted family friend, he was bigger and older than the child, and was in charge of the child during the visits at defendant's home. This Court holds, therefore, that, if the alleged victim is a minor child, evidence of subtle and/or psychological force may be sufficient to support conviction of an accused who is an authority figure to that child, even in the absence of any express threat of harm or significant physical restraint. See id. The jury instruction given by the trial court on the issue of force was not incorrect."
 {¶ 43} Furthermore, the Milam court went on to note that it would not use the definition of force as used in Schaim because the victim inSchaim was an adult. Milam, 2006-Ohio-4742 at ¶ 14. The victim inMilam was 13 years old. However, the court went on to state that the victim was "not of so tender age as the children in Eskridge andDye." Id. Thus, Milam concluded that the question was whether the child's will was overcome by fear or duress. Id. In finding that the child's will was overcome by duress, the Milam court referenced the psychological force used and the perpetrator's position of authority over the child. Id. at ¶ 25.
 {¶ 44} We agree with the holding of our sister district and find thatDye does not preclude an instruction on the Eskridge psychological force instruction when the victim is still a minor but is 13 years or older. We agree with Milam that the question in this type of case where the victim is not of so tender an age as Eskridge is whether the *Page 10 
victim's will was overcome by fear or duress. We note that other appellate districts would also find as such. See State v. Dippel, 10th Dist. No. 03AP-448, 2004-Ohio-4649 (victim was 14 years old); State v.Oddi, 5th Dist. No. 02CAA01005, 2002-Ohio-5926 (victim was 15 years old); State v. Nieland, 2d Dist. No. 2005-CA-15, 2006-Ohio-784 (victim was raped when 15 and 16, court questioned whether Eskridge instruction was appropriate but since the victim testified that she did not resist him because she was afraid of what he might do to her was enough to support the force element).
 {¶ 45} Consequently, error, plain or otherwise, did not result from the trial court's Eskridge psychological force instruction. This assignment of error lacks merit.
FIFTH ASSIGNMENT OF ERROR {¶ 46} "THE TRIAL COURT ERRED IN PROVIDING THE ESKRIDGE DEFINITION OF FORCE WHERE THE APPELLANT WAS NOT IN A POSITION OF AUTHORITY AND WHERE THE JURORS WERE NOT INSTRUCTED TO DETERMINE WHETHER THE APPELLANT HELD A POSITION OF AUTHORITY."
 {¶ 47} The fifth assignment of error also deals with the trial court's instruction on force. As such, it is addressed at this point. Like the above assignment, this assignment of error is also reviewed under a plain error standard.
 {¶ 48} The specific argument Haschenburger makes is that the trial court should not have instructed on the Eskridge definition of force because he did not hold a position of authority over D.M. and the evidence would not support such a finding. In the alternative, Haschenburger argues that the instruction should have been worded in such a way to instruct the jury to determine if he was an authority figure.
 {¶ 49} As explained above, the Eskridge psychological force instruction indicates that the perpetrator must be in a position of authority over the victim. In Dye, the Court indicated that the position of authority is not limited to parents or stepparents. Furthermore, inOddi, it was found that a driver's education instructor held a position of authority over the fifteen and half year old girls taking the driving class. Oddi, 5th Dist. No. 02CAA01005, 2002-Ohio-5926.
 {¶ 50} Thus, as the above shows, the perpetrator does not have to be a parent for a position of authority to be found. Here, the evidence presented at trial indicated that Haschenburger was a close family friend to D.M.'s father, Dennis, and was *Page 11 
roughly her father's age. (Tr. 402, 405). He was over the house constantly. (Tr. 303, 421). He celebrated holidays with the family, which included them giving him presents. (Tr. 303, 410-411). He brought pizza, games and movies over to the children. He was viewed as part of the family. (Tr. 303, 421). For example, when he was sick they did special things for him. (Tr. 411). D.M. testified she viewed him "like a fun uncle." Furthermore, he was the uncle of D.M's best friend. Admittedly, D.M. testified that Haschenburger never had disciplinary authority over her. (Tr. 347). However, when that statement is taken in conjunction with the rest of her testimony, we cannot conclude that plain error resulted from the instruction. Given the close interaction with the family and the way they treated him, this evidence could support a position of authority finding. Thus, the instruction was warranted.
 {¶ 51} That said, this leads us to Haschenburger's argument that the trial court did not present the issue of position of authority to the jury. Haschenburger contends the trial court made the factual finding that he was in a position of authority over D.M. We disagree.
 {¶ 52} The trial court never stated that Haschenburger was an authority figure. The trial court did state that, "when the relationship between the victim and the defendant is one of child and parent or any other parental or elder authority figure." The trial court then gave other examples as an uncle, grandparent, or stepfather.
 {¶ 53} While the trial court should probably have not given the examples, we cannot find that doing so amounted to plain error. A review of the instruction reveals that the jury was not instructed that Haschenburger was in a position of authority. Rather, the instruction left the jury free to determine whether or not Haschenburger held a position of authority. Therefore, this assignment of error lacks merit.
THIRD ASSIGNMENT OF ERROR {¶ 54} "THE APPELLANTS CONVICTIONS IN THE INSTANT MATTER ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE."
 {¶ 55} Under this assignment, Haschenburger argues that the rape convictions were not supported by sufficient evidence. Sufficiency is a question of law. State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52; State v. Smith, 80 Ohio St.3d 89, 113, 1997-Ohio-355. In a sufficiency analysis, an appellate court presumes that the *Page 12 
State's evidence is true, but questions whether that evidence satisfied each element of the offense. See State v. Getsy,84 Ohio St.3d 180, 193, 1998-Ohio-533. "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v.Virginia (1979), 443 U.S. 307. "[T]he weight to be given the evidence and the credibility of witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 56} R.C. 2907.02(A)(2) states that "no person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." The element at issue here is "force or threat of force."
 {¶ 57} As aforementioned, we found that the Eskridge psychological force instruction could be given even despite the fact that D.M. was 14 when the alleged sexual conduct began. Furthermore, as was stated above, the question is whether the victim's will was overcome by fear or duress. Milam, 2006-Ohio-4742 at ¶ 14.
 {¶ 58} "In determining whether a course of conduct results in duress, the question is not what effect such conduct would have upon an ordinary man but rather the effect upon the particular person toward whom such conduct is directed, and in determining such effect the age, sex, health, and mental condition of the person affected, the relationship of the parties and all the surrounding circumstances may be considered."State v. Woods (1976), 48 Ohio St.2d 127, 135-136, overruled in part, on other grounds, by State v. Downs (1977), 51 Ohio St.2d 47, paragraph one of the syllabus.
 {¶ 59} The state presented evidence that Haschenburger was a close family friend. Dennis, D.M.'s father, testified that he had known Haschenburger all his life and considered him a very good friend. (Tr. 402, 405, 411). Both D.M. and Dennis stated that Haschenburger spent many holidays with the family. (Tr. 303, 410-411). He was always invited to Thanksgiving and they had Christmas presents for him. (Tr. 410-411). When he was sick, they did special things for him and bought him special foods when he was having a sugar problem. (Tr. 411). D.M. and her mom, Beverly, *Page 13 
testified that Haschenburger was considered part of the family and was over the house frequently. (Tr. 303, 421). Beverly even stated that sometimes she thought he was over their house too frequently. (Tr. 421). D.M., Beverly, and Dennis explained that Haschenburger would bring pizza over for the children, watch TV, rent movies and play games with the children. (Tr. 304, 405, 421, 427). D.M. also indicated that while Haschenburger did not have disciplinary authority over her, she considered him a part of the family, like a fun uncle. D.M. and Dennis also testified that Haschenburger would often call the house for her and tell her parents that he had a question about the computer. (Tr. 310, 406). D.M. was knowledgeable about computers so her parents would give the phone to her. (Tr. 310, 406). D.M. also explained that Haschenburger would come over a lot when her parents were not home and she would let him in the house through the outside entrance to the basement. (Tr. 312). She stated that she let him in because he told her she had to. (Tr. 313). She testified that he was very possessive and did not want her to hang out with her friends. (Tr. 323). He would show up at her work and jeopardize her work by making her talk to him and once in a while he would cause a scene. (Tr. 327, 328). She testified that he would on some occasions show up at her work, tell her he was her ride home, but instead of going straight home, they would have sex in his car. (Tr. 329-330).
 {¶ 60} This evidence shows the position of authority over D.M. that Haschenburger held. He used the position he had as being a surrogate part of the family to manipulate and take advantage of D.M. He used pizza, games and questions about the computer to get closer to her. Although D.M. admitted he did not have disciplinary authority over her, she still listened to him. Evidence of that is the fact that when he came to the door he told her she had to let him in and she did.
 {¶ 61} Furthermore, the record also shows that the sexual conduct between D.M. and Haschenburger occurred when she was 14, 15 and 16 years old. (Tr. 314). Haschenburger at that time was 42, 43, and 44 years old respectively. D.M. also testified that he was a lot bigger and heavier than her so she was unable to fight back. (Tr. 314). At the time, D.M. testified she was between 5'6" and 5'8" and about 162 pounds. (This was approximately 5 years after the rapes started.) Pictures admitted at trial showed what he looked like at the time of the rapes and he appeared to be a *Page 14 
rather large heavy set man. D.M. testified that she told him no a lot but he did not stop.
 {¶ 62} D.M. also testified that Haschenburger forced her to have sex with him. (Tr. 308). D.M. said that he would unzip her pants and undress her. (Tr. 308). She testified that she told him no a lot, but he did not stop. (Tr. 313). She explained that she had seen him get mad before and saw him throw tantrums and throw things. (Tr. 309). She stated that it scared her when she saw that. (Tr. 309). She explained that he made her instant message him and she did so because if she did not he would get mad. (Tr. 309). She stated that she e-mailed for the same reason and wrote what he wanted to hear so that he would not get mad.
 {¶ 63} This evidence shows that she did not want him mad and she was fearful of him getting mad. When viewed in the light most favorable to the prosecution, the above evidence supports the conclusion that D.M.'s will was overcome by duress. All surrounding circumstances to the abuse indicate as such. Thus, sufficient evidence was submitted to prove the rapes for the first nine counts of the indictment. However, as is explained below, we limit the above holding to the first nine counts of the indictment.
 {¶ 64} The tenth count of the indictment states that sexual conduct occurred between January 1, 2003 and July 26, 2003. D.M. testified as to one occurrence that happened during this period. This was the time she told her parents she was going to a sleep over at a friends, but instead of doing that she stayed all night at Haschenburger's house. (Tr. 323). D.M. then goes on to testify that it was at this time that the sexual conduct was dwindling off and that was because she realized she could stop it if she was too busy to see him. (Tr. 356). At that point when she realized she could stop it, the psychological force element is no longer met, her will was not being overcome by fear or duress. She shows that she was no longer under his influence. This is specifically so when considering at the time of this alleged rape she was over 16 years old and she took the overt action of driving to his house and spending the night there. The support for the psychological force with the other counts is based partly on the fact that the conduct is occurring in her own home and she was required to let him in or that the conduct was occurring in his car when he drove her *Page 15 
home from work. The act of actually going to the perpetrator for the final count makes a difference when it is considered along with her realization that she could make it stop and eventually did by becoming unavailable. Thus, for that reason we cannot find that there was sufficient evidence to support the conviction on the final count of rape.
 {¶ 65} Consequently, this assignment of error has no merit as to the first nine counts of the indictment. However, the tenth count has merit. Thus, that conviction is reversed.
FOURTH ASSIGNMENT OF ERROR {¶ 66} "THE UNDERLYING CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 67} Appellate review of a claim that a verdict is against the manifest weight of the evidence requires the reviewing court to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins, 78 Ohio St.3d at 387. Reversal will be ordered in only the most exceptional cases in which the evidence weighs heavily against conviction. Id.
 {¶ 68} The testimony that is referenced above supporting the finding that the first nine counts of the indictment were supported by sufficient evidence, also support the conclusion that those verdicts were not against the manifest weight of the evidence. Testimony revealed that Haschenburger had sex with D.M. She claimed that she told him no. She stated that he forced her, that she was afraid of him and that if she did not have sex with him he would threaten to tell her parents about them. Dr. Dewar also testified that D.M. was a victim of child sexual abuse. D.M. and her parents testified about the relationship Haschenburger had with the family. That relationship could support a finding that Haschenburger was in a position of authority. Thus, we cannot find that the jury lost its way when it found Haschenburger guilty of the first nine counts of rape. As the last count is already being reversed due to insufficient evidence, it will not be addressed. This assignment of error lacks merit.
SIXTH ASSIGNMENT OF ERROR *Page 16 {¶ 69} "TRIAL COUNSEL WAS INEFFECTIVE WHEN SHE FAILED TO OBJECT TO THE DEFINITION OF `FORCE' AS DEFINED FOR THE JURORS."
 {¶ 70} This assignment of error is closely related to the second and fifth assignments of error. Under this assignment of error, Haschenburger claims trial counsel was ineffective for failing to object to the psychological force instruction.
 {¶ 71} We review Haschenburger's claim under the two-part test ofStrickland v. Washington (1984), 466 U.S. 668. "To obtain a reversal of a conviction on the basis of ineffective assistance of counsel, the defendant must prove (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome of the proceeding." State v. Madrigal,87 Ohio St.3d 378, 388-389, 2000-Ohio-448. When evaluating an ineffective assistance of counsel claim, "[j]udicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v.Bradley (1989), 42 Ohio St.3d 136.
 {¶ 72} This assignment of error is dependent upon this court's decision under assignments of error numbers two and five. We found no error, plain or otherwise, with the trial court's use of theEskridge force instruction. In fact, we cited to other appellate courts who have likewise held the same. Thus, as no error occurred, we cannot find that counsel's performance was deficient. Consequently, the ineffective assistance of counsel claim fails and this assignment of error has no merit.
SEVENTH ASSIGNMENT OF ERROR {¶ 73} "THE TRIAL COURT ERRED IN PERMITTING WITNESSES TO BOLSTER THE CREDIBILITY OF THE ALLEGED VICTIM."
 {¶ 74} Under this assignment of error, Haschenburger argues that the doctor's testimony and testimony from D.M.'s then current boyfriend, John, was used to bolster D.M.'s testimony.
 {¶ 75} As it relates to the doctor, this assignment of error is very similar to the first assignment of error. Thus, as stated above, the doctor's testimony did not relate *Page 17 
to D.M.'s credibility. Rather, the testimony merely established that it was the doctor's medical opinion that sometime during D.M.'s childhood she was a victim of child sexual abuse. Thus, for the reasons stated under the first assignment of error, any argument made as to the doctor under this assignment of error fails.
 {¶ 76} Regarding John, D.M.'s boyfriend, he testified that she told him that Haschenburger raped her. His testimony indicated things that D.M. told him. Nowhere in his testimony is there a statement that D.M. was credible. Moreover, the information he provided indicated when D.M. first told her parents and what brought about her telling her parents. He did not testify as to D.M.'s veracity. Thus, we cannot find that his testimony was used to bolster D.M.'s credibility. This assignment of error has no merit.
EIGHTH ASSIGNMENT OF ERROR {¶ 77} "THE APPELLANT'S FEDERAL AND STATE RIGHTS TO DUE PROCESS RIGHTS WERE VIOLATED WHERE THE STATE FAILED TO INDICT THE APPELLANT WITH SUFFICIENT SPECIFICITY."
 {¶ 78} Under this assignment of error, Haschenburger argues that the indictment was not made with sufficient specificity because when looking at the ten counts of rape, each count looks identical. Or, in his words, "there are absolutely no distinctions made. Mr. Haschenburger was prosecuted for a single criminal act (rape) that occurred ten times, rather than for ten separate criminal acts." Furthermore, according to him, the evidence did not go to ten separate acts of rape, but was a description of "typical" sexual encounters.
 {¶ 79} The indictment does not allege a certain single date for each of the rapes. Rather, each count lists a time period which spans anywhere from a month to six months on each count. For instance, the first count alleges that the rape occurred on or between July 26, 2000 and August 31, 2000. The tenth count alleges the rape occurred on or between January 1, 2003 and July 26, 2003.
 {¶ 80} At trial, D.M. testified that the rapes occurred after she turned 14 and continued up until prior to her 17th birthday. She stated that during this time period, it occurred almost on a weekly basis. *Page 18 
 {¶ 81} "Because the precise date and time of the offense of rape are not essential elements of that crime, a certain degree of inexactitude in averring the date of the offense is not necessarily fatal to its prosecution." State v. Krzywkowski, 8th Dist. No. 80392, 2002-Ohio-4438, quoting State v. Marrs, 2d Dist No. 18903, 2002-Ohio-3300 citingState v. Sellards (1987), 17 Ohio St.3d 169; State v. Lawrinson (1990),49 Ohio St.3d 238.
 {¶ 82} Thus, given the nature of the offenses (rape of a minor) and the testimony offered, we cannot find that the indictment was insufficient as to dates. This assignment of error lacks merit.
NINTH ASSIGNMENT OF ERROR {¶ 83} "THE APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A TRIAL BY JURY BY MAXIMUM AND CONSECUTIVE TERMS OF IMPRISONMENT."
 {¶ 84} The argument made under this assignment of error is based upon the Ohio Supreme Court's decision in State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856.
 {¶ 85} In Foster, the Ohio Supreme Court held that the provision of the Revised Code relating to nonminimum (R.C 2929.14(B)), maximum (R.C.2929.14(C)), and consecutive (R.C. 2929.14(E)(4)) sentences are unconstitutional because they require judicial findings of fact not proven to a jury beyond a reasonable doubt or admitted by the defendant. Id. at paragraphs one and three of the syllabus. The Court then went on to hold that those unconstitutional provisions could be severed. Id. at paragraphs two and four of the syllabus. Since the provision could be severed, "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." Id. at paragraph seven of the syllabus.
 {¶ 86} Thus, the implication of Foster, is that trial courts are no longer required to give reasons or findings prior to imposing maximum, consecutive, and/or nonminimum sentences; it has full discretion to impose a sentence within the statutory range. Id. at, ¶ 100. However, if a trial court does state findings and reasons for imposing maximum, consecutive and/or nonminimum sentences, the sentence must be vacated and the cause remanded to the trial court for a new sentencing hearing in order for the sentencing to comport with Foster. Id. at ¶ 104. Once this is ordered, a *Page 19 
defendant, while entitled to a new sentencing hearing, may choose to waive the hearing, and have the sentencing court act on the record before it. Id. at ¶ 105.
 {¶ 87} The Ohio Supreme Court explained:
 {¶ 88} "These cases and those pending on direct review must be remanded to trial courts for new sentencing hearing not inconsistent with this opinion. We do not order resentencing lightly. Although new sentencing hearings will impose significant time and resource demands on the trial courts within the counties, causing disruption while cases are pending on appeal, we must follow the dictates of the United States Supreme Court. Ohio's felony sentencing code must protect Sixth Amendment principles as they have been articulated.
 {¶ 89} "Under R.C. 2929.19 as it stands without (B)(2), the defendants are entitled to a new sentencing hearing although the parties may stipulate to the sentencing court acting on the record before it. Courts shall consider those portions of the sentencing code that are unaffected by today's decision and impose any sentence within the appropriate felony range. If an offender is sentenced to multiple prison terms, the court is not barred from requiring those terms to be served consecutively. While the defendants may argue for reductions in their sentences, nothing prevents the state from seeking greater penalties.United States v. DiFrancesco (1980), 449 U.S. 117." Id. at ¶ 104-105.
 {¶ 90} In the instant case, the trial court made maximum sentence findings and consecutive sentence findings in accordance with the felony sentencing statute. Those specific findings have been rendered unconstitutional by Foster. Thus, in accordance with Foster and its progeny, the sentence must be vacated and the cause remanded for resentencing.
 {¶ 91} Haschenburger, however, argues that the Foster remedy creates an ex post facto law. Recently we have stated that this argument is not ripe for review and will not be ripe until resentencing has occurred.State v. Stroud, 7th Dist. No. 05MA179, 2006-Ohio-7079, ¶ 16. Furthermore, we have stated that we lack authority to declareFoster unconstitutional, i.e. that it violates the ex post facto clause.State v. Mills, 7th Dist. No. 06BE14, 2006-Ohio-7077, ¶ 26. Thus, any argument regarding a violation of the ex post facto clause fails. *Page 20 
 {¶ 92} The sentences must be vacated and the cause remanded for resentencing in accordance with Foster. This assignment of error has merit.
 {¶ 93} For the foregoing reasons, the convictions are affirmed in part, reversed in part, vacated in part, and remanded for resentencing. The convictions for counts one through nine in the indictment are affirmed. However, the conviction for count ten is reversed due to lack of sufficient evidence. Thus, the sentence for count ten is vacated. The cause is remanded for resentencing on the remaining convictions.
DeGenaro, P.J., dissents; see dissenting opinion.
Waite, J., concurs.