JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Errick Shelton, appeals his conviction and sentence from the Cuyahoga County Court of Common Pleas. After reviewing the facts of the case and the pertinent law, we affirm.
 {¶ 2} On September 27, 2005, the Cuyahoga County Grand Jury indicted Shelton on twenty-two counts, including three counts of aggravated burglary, with repeat violent offender ("RVO") specifications and notice of prior conviction ("NPC") specifications, one count of kidnaping, with RVO and NPC specifications, two counts of domestic violence, one count of felonious assault, with RVO and NPC specifications, five counts of felonious assault, with one- and three-year firearm specifications, as well as RVO and NPC specifications, one count of assault, two counts of having weapons while under disability, one count of attempted murder, with *Page 3 
one- and three-year firearm specifications, and RVO and NPC specifications, four counts of improperly discharging firearm at or into a habitation, with one- and three-year firearm specifications, and RVO and NPC specifications, one count of menacing by stalking, with one- and three-year firearm specifications, and one count of carrying a concealed weapon. Shelton entered a plea of not guilty to the charges.
 {¶ 3} A jury trial commenced on May 15, 2006. The following testimony was presented at trial.
 {¶ 4} The state called Janiera Levert ("Janiera") first to testify. She lives on the southeast side of Cleveland with her six children. Janiera stated that Shelton lived with her and her children from September 2004 to June 2005. She further stated, however, that once he moved out, Shelton was not welcome in her home and that he no longer possessed a key to her house.[1]
 {¶ 5} Janiera testified that on the day in question, August 22, 2005, Shelton followed her, pushed his way into her home, and a fight ensued. She said that Shelton grabbed her hair and pulled out about thirty-five micro braids that were "all the top [of her head]." Next, he bit her on the shoulder and she fell to the floor. Shelton then left her home. Janiera also testified that two of her children, M.L. and *Page 4 
Do.L, her niece, T.L., and her nephew were also involved in the fight.[2] Janiera stated that the wound on her shoulder was, "like, real open and you could tell there was teeth marks, but it was like my bone right here was kind of open and it was just like a bite mark." She also testified that her head "felt like somebody was just pulling it from the roots and [her] shoulder was burning and just sore."
 {¶ 6} Two days later, on August 24, 2005, Janiera was sitting on her front porch when Shelton pulled up in front of her house in a 1996 rusty-orange Cavalier. She recognized the vehicle because Shelton had originally bought it for her, but had taken it back two days earlier. He said, "[c]ome here, bitch" and she replied, "[n]o." He then stated, "[y]ou better not be here when I get back." Janiera went inside her house because she was scared.
 {¶ 7} Her niece came into the house "real fast" and Janiera ran to the basement. Janiera heard Shelton say, "[w]here that bitch at?" When she was in the basement, she heard a loud "pow" from a gun and debris fell on her head "real fast like the bullet." She also testified that the bullet passed by the top of her head "real close"and that she "could feel the wind." Janiera did not see the gun. When she came up from the basement, the police were at her house.
 {¶ 8} Next, Janiera testified that early in the morning on August 25, 2005, she was sleeping in her bed and woke up to a noise. She called the police. *Page 5 
 {¶ 9} On cross-examination, Janiera acknowledged that she had told defense counsel prior to trial that she never saw Shelton shoot a gun on any of the days in question. She further agreed that she never saw Shelton in her basement on August 22, 2005, or saw him on August 25, 2006.
 {¶ 10} The state then presented thirteen-year-old Do.L, who is Janiera's daughter. She testified that on August 22, 2005, she tried to get Shelton off of her mother. Do.L. said that Shelton bit her on the wrist which caused a cut. She then went to her grandmother's house and called the police.
 {¶ 11} She stated that on August 24, 2005, she was looking out her bedroom window and saw Shelton walk up to the house. She did not see anything in Shelton's hands, but said, "[a]s soon as he walk in the house, that's when I heard it." The prosecutor asked, "[w]hat did you hear?" Do.L. replied, "a gunshot."
 {¶ 12} On cross-examination, Do.L. said that on August 22, 2005, Shelton was already inside of the house when Janiera went into the house. During the fight, neither Janiera nor Shelton fell or got pushed to the floor. She also stated that the fight lasted a couple of minutes.
 {¶ 13} M.L., who is fourteen years old, testified after Do.L. M.L. stated that on August 22, 2005, she witnessed Shelton grab her mother's hair, bite her mom on the shoulder, and bite Do.L. M.L. then called the police. Shelton left before the police arrived. *Page 6 
 {¶ 14} M.L. said that on August 24, 2005, she saw Shelton come inside her house, load a gun, and walk into the kitchen. She then heard a gun shot. She described the gun as being black, not small and not big. She then made an in-court identification of the gun.
 {¶ 15} M.L. testified that on August 25, 2005, she was in her room when she looked out her window and saw Shelton in front of the house. She saw him pull a gun from his waistband, aim it at her mother's room, and shoot it.
 {¶ 16} On cross-examination, M.L. stated that on August 22, 2005, Shelton was already inside her house when Janiera got home. During the fight, Janiera was on the floor. She also testified that the fight lasted forty minutes. M.L. agreed that she never actually saw Shelton shoot the gun on August 24, 2005 or on August 25, 2005, but rather, saw Shelton point the gun "close by my mom's room" and then heard a shot. She also said that Janiera was in that bedroom.
 {¶ 17} The next witness to testify was T.L. She is sixteen years old. Janiera is her aunt and T.L. lived with her from June 2005 to August 24, 2005. T.L. was present during the August 22, 2005 and August 24, 2005 events and confirmed Janiera's version of what occurred those days.
 {¶ 18} T.L. said that on August 24, 2005, Shelton pulled up to Janiera's house in a red vehicle. She testified that Shelton had a gun, pulled the slide back, and put it in his pants. T.L. said that she then went into the kitchen and said to Janiera, *Page 7 
"[y]ou better run, because [Shelton is] coming with a gun." T.L. ran out the back door and heard one gunshot.
 {¶ 19} On cross-examination, T.L. testified that on August 22, 2005, Janiera had been inside the house when Shelton arrived. She further said that the physical fight lasted twenty minutes.
 {¶ 20} D.F. testified after T.L. He is fifteen years old. He stated that on August 24, 2005, Shelton came to Janiera's house in a burgundy Cavalier. He saw Shelton cock a gun and go inside the house. He then heard a gunshot.
 {¶ 21} D.F. further testified that on August 25, 2005, a friend drove him home and dropped him off at his house. He saw Shelton walk down a side street "cut" that was near his house. D.F. then went inside his house to lie down. He later heard a gunshot. Janiera called the police.
 {¶ 22} On cross-examination, he stated that he never saw Shelton's Cavalier on August 25, 2005. He also did not see Shelton after he walked down the "cut" or see him fire a gun that night.
 {¶ 23} The state then called sixteen-year-old De.L. to testify. He is Janiera's son. On August 24, 2005, he was sleeping on a couch in the living room when he awoke and saw Janiera and T.L. run through the house. He then saw Shelton enter the living room and drop bullets on the ground. De.L. testified, "[Shelton] grabbed the gun he had in his hand and was fumbling with the clip of the gun." De.L. then saw Shelton, "put the clip in the gun and he walked toward the kitchen. He cocked *Page 8 
the gun back and he aimed it towards the floor, like he knew directly where he was pointing it to and he shot." De.L. went to a store and asked someone to call 9-1-1. He then described the gun as black and made an in-court identification of it. De.L. also stated that on August 25, 2005, between 1:00 a.m. and 3:00 a.m., he heard a gunshot.
 {¶ 24} The state then presented Adrienne Slaughter ("Adrienne"), Janiera's cousin, as its next witness. On August 24, 2005, she was at her home located at 4061 East 139th Street, Cleveland, Ohio. She was in her basement all day braiding hair for customers. She testified that Shelton came over her house earlier that day. She stated, "I guess he was sleeping upstairs, because I was busy downstairs doing hair."
 {¶ 25} Later that night, Adrienne said that Shelton told her that he had to go to his mother's house to get money. Shelton drove the Cavalier while Adrienne sat in the passenger seat. Shelton parked the Cavalier at 103rd Street and Harvard Avenue. He said, "I'm going to park right here so I could go to my mom's house. I don't want to chance Janiera seeing the vehicle."
 {¶ 26} Adrienne called Shelton's cell phone when he did not return quickly. She testified that he said, "[I'm] coming, [I] was doing something." She stated that it was about 1:00 a.m. on August 25, 2005, but she was not certain of the time because it was late. Shelton called her later on her cell phone and said that he was done. She picked him up around 100th Street and Harvard Avenue. *Page 9 
 {¶ 27} She then saw a light purple Taurus pull behind the Cavalier. Shelton said "[d]on't you see the police behind you? Pull in this driveway." She stated that she saw Shelton "pull a gun out his back. I thought he got out with the gun, but he obviously dropped it in the passenger seat. * * * And I was getting out [of] the car as he got out to run and everybody said, `Freeze.'"
 {¶ 28} On cross-examination, Adrienne testified that on August 25, 2005, Shelton left the Cavalier for a half hour to an hour, but she was not sure because she was tired.
 {¶ 29} The next witness to testify was Officer John Ludrosky ("Officer Ludrosky") of the Cleveland Police Department. On August 22, 2005, he was working in a two-man cruiser with Officer Kinas. They received a call to respond to a Harvard Avenue address for a domestic violence situation. When they pulled up to the house, Janiera walked outside, and it looked like she had been in a physical altercation. Her hair was a mess and her shirt was ripped. There were younger children on the scene and everyone was agitated. Janiera had a bite on her shoulder that was red, bleeding, and abraded. She told Officer Ludrosky that her hair had been pulled. Officer Ludrosky said that the male suspect was not on the scene when they arrived.
 {¶ 30} Next to testify for the state was Detective Michael Belle ("Detective Belle") of the Cleveland Police Department, Crime Scene Investigation Unit ("CSI"). On August 25, 2005, he was on duty when he heard a radio call explaining that a *Page 10 
male shot into a habitation on Harvard Avenue and giving the description of a red Cavalier. He then noticed a vehicle that fit the description on Harvard Avenue, near 114th Street, and he reported the location. He followed the vehicle until other officers assisted. He saw the female driver pull into a driveway and the male passenger jump out of the vehicle, but police officers apprehended him. He further stated that he processed the scene.
 {¶ 31} Detective Belle photographed the vehicle with the gun inside. He believed the gun was on the passenger floor of the front seat. He then made an in-court identification of the gun. He also photographed the residence and recovered evidence. He found a "spent" shell casing outside, in front of the house, near the sidewalk. He also recovered metal fragments of a suspected bullet that was inside the house on a table. He further testified that he conducted a gunshot residue test on Shelton.
 {¶ 32} Next, the state called Officer Brian Todd ("Officer Todd") of the Cleveland Police Department to testify. On August 25, 2005, he was working with his partner, Officer David Harris when they heard Detective Belle's radio call and they drove to assist him. Officer Todd corroborated Detective Bell's testimony. He then responded to the Harvard Avenue residence.
 {¶ 33} Officer Todd testified that he searched the area outside, while his partner went inside to get information from the family. He found a shell casing on the sidewalk in front of the house and marked its location. He stated that Detective *Page 11 
Belle came to the scene, took photographs, and recovered the evidence.
 {¶ 34} Officer David Harris ("Officer Harris") of the Cleveland Police Department testified next. On August 25, 2005, he was working with his partner, Officer Todd. He corroborated Officer Todd's and Detective Belle's testimony. Additionally, he stated that a bullet entered the bedroom window and stopped a few feet away near the wall.
 {¶ 35} The state then presented Officer Rich Tusing ("Officer Tusing") of the Cleveland Police Department. On August 24, 2005, he was working with his partner, Officer Stone. He received a call to respond to a Harvard Avenue residence because shots had been fired. He arrived five minutes later and began to interview witnesses. He and Janiera located the bullets' point of entry, where the suspect had shot through the kitchen floor. He located a shell casing near the stove in the kitchen. The shell casing was directly to the right of the point of entry. Then, Janiera showed him where she had been hiding in the basement. On cross-examination, he stated that he did not find a bullet in the basement, but said that was not unusual.
 {¶ 36} Donna Rose of the Ohio Bureau of Criminal Identification and Investigation ("BCI") testified next. She is a forensic scientist and performs gunshot residue testing. She stated that residue gets on someone's hands by discharging or being near a discharged firearm, or handling an item with residue on it. Gunshot residue is easily washed away or rubbed off. *Page 12 
 {¶ 37} She performed a gunshot residue test on a sample provided by the Cleveland Police Department. In her report, she stated, "[p]articles highly indicative of gunshot primer residue were identified on the left hand and right hand samples of Errick Shelton."
 {¶ 38} Detective James Ealey ("Detective Ealey") of the Cleveland Police Department also testified for the state. He works in the technical section of the forensics unit. He performs operability and trigger pull tests on guns, and compares bullets and casings. He stated that he test fired the gun that police retrieved from the Cavalier and determined it was operable. He compared a test fire to the casing retrieved from the scene of the crime and determined that they matched. He also examined a bullet and determined it was fired from the gun retrieved from the Cavalier. He compared a second shell casing and determined it also came from the same gun.
 {¶ 39} Then, outside the presence of the jury, Shelton orally and in writing waived a jury trial with respect to two counts of having weapons while under disability and all the RVO specifications. The state nolled counts thirteen, fourteen, fifteen, seventeen, eighteen, and nineteen. The state then rested its case.
 {¶ 40} At the close of the case, Shelton moved for a Crim.R. 29 acquittal, particularly arguing the attempted murder charge. Over the objection of the state, the court granted the Crim.R. 29 motion with respect to the attempted murder charge. Shelton then rested his case. *Page 13 
 {¶ 41} On May 19, 2006, the jury found Shelton guilty of domestic violence, with NPC specifications in counts three and ten; felonious assault in count four; aggravated burglary, with one- and three-year firearm specifications in counts six and seven; felonious assault, with one- and three-year firearm specifications in counts eight and sixteen; improperly discharging firearm at or into a habitation, with one- and three-year firearm specifications in count twelve; menacing by stalking, with one- and three-year firearm specifications in count twenty-one; and carrying a concealed weapon in count twenty-two. Shelton then entered a plea of no contest to having weapons while under disability in counts nine and twenty, and the trial court found him guilty.
 {¶ 42} On May 25, 2006, the trial court held Shelton's sentencing hearing. The state dismissed all of the RVO specifications. The court then sentenced Shelton to one year on each of counts three, four, ten, twenty-one, and twenty-two; three years on each of counts nine and twenty; three years on the firearm specification to run prior to and consecutive with the one year sentence on count twenty-one; three years on the firearm specification to run prior to and consecutive with the four year sentence on count twelve and sixteen; three years on the firearm specification to run prior to and consecutive with the five year sentence on each of counts six, seven, and eight. The court further ordered counts three, four, seven, eight, nine, ten, sixteen, twenty, and twenty-one to run concurrently and counts six and twelve to run consecutively. Thus, Shelton was sentenced to a total of fifteen years in prison with *Page 14 
five years of post release control.
 {¶ 43} It is from this judgment that Shelton filed a notice of appeal and raises the following three assignments of error.
 {¶ 44} "[1.] The state failed to present sufficient evidence to sustain a conviction against Appellant."
 {¶ 45} "[2.] Appellant's convictions are against the manifest weight of the evidence."
 {¶ 46} "[3.] The trial court erred by ordering Appellant to serve a consecutive sentence without first considering a concurrent sentence and by making findings not supported by the record."
 {¶ 47} In his first assignment of error, Shelton asserts that his convictions are against the sufficiency of the evidence.
 {¶ 48} After reciting the well-established law on sufficiency of the evidence, Shelton's entire argument consists only of the following:
 {¶ 49} "The stories by these alleged victims are quite similar and certainly this cannot be coincidence. The lack of credibility of all the testimony as a whole and the lack of evidence makes the convictions here insufficient to stand as a matter of law."[3] *Page 15 
 {¶ 50} Shelton sums up his argument with:
 {¶ 51} "Accordingly, there was a failure to prove the above listed crimes beyond a reasonable doubt and therefore, those convictions should be reversed and vacated."
 {¶ 52} Under App.R. 16(A)(7), an appellant must put forth an argument containing the contentions with respect to each assignment of error. In the argument, an appellant must also give "reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Id. If not, App.R. 12(A)(2) permits an appellate court to "disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based * * * as required under App.R. 16(A)."
 {¶ 53} In the case at bar, besides setting forth the law on sufficiency of the evidence, appellant's argument, that the evidence was not sufficient to convict him of multiple counts of several crimes, is two sentences long. He fails to make any references to the record where he claims the evidence is not sufficient. He further fails to point out how the evidence presented by the state was insufficient to prove any of the elements of any of the charges he was convicted of. Thus, this court does *Page 16 
not have to consider this issue. Nevertheless, we will briefly address it.
 {¶ 54} Sufficiency of the evidence is the legal standard which is applied to determine whether the evidence is legally sufficient to support a jury verdict as a matter of law. Thompkins, supra, at 386. Legal sufficiency is a test of adequacy and is a question of law. Id., citing State v. Robinson (1955), 162 Ohio St. 486. When determining sufficiency of the evidence, we must consider whether, after viewing the probative evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the offense proven beyond a reasonable doubt. State v. Shaffer, 11th Dist. No. 2002-P-0133, 2004-Ohio-336, at_17.
 {¶ 55} Shelton was convicted of domestic violence, felonious assault, aggravated burglary, having weapons while under a disability, improperly discharging a firearm at or into habitation, menacing by stalking, and carrying a concealed weapon.[4] *Page 17 
 {¶ 56} After reviewing the testimony of sixteen witnesses in a light most favorable to the state, as well as the respective elements of each conviction, we conclude the evidence was overwhelmingly sufficient to convict Shelton of the crimes beyond a reasonable doubt. The evidence included consistent testimony from several witnesses regarding the events of August 22, 24, and 25, 2005, as well as reliable evidence that a gun found with Shelton when he was apprehended by the police matched spent shell casings and bullet fragments that were also found at the scene. In addition, there was also reliable evidence Shelton had gunshot residue on his left and right hands.
 {¶ 57} As such, Shelton's first assignment of error is overruled.
 {¶ 58} In his second assignment of error, Shelton argues that his convictions were against the manifest weight of the evidence. His argument in this assignment is similarly lacking. After reciting nearly two pages of the law on the standard of review for manifest weight, Shelton states only:
 {¶ 59} "Here, the jury simply lost its way as to the convictions. They were *Page 18 
looking to blame someone. Although there is no credible evidence that Appellant was involved in these crimes, the jury nevertheless convicted him. As stated under Assignment of Error 1, there is not the requisite evidence for a conviction."
 {¶ 60} As in his first assignment of error, Shelton does not offer any reasons or argument as to why the evidence is not credible. He simply makes a blanket statement that there is no credible evidence. Thus, for the same reasons we did not have to address Shelton's sufficiency argument, we do not have to address his manifest weight argument. Briefly, however, in the interest of justice we will also address this assignment.
 {¶ 61} Although a judgment of a trial court is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the weight of the evidence. Thompkins, supra, at 387, citingRobinson, supra, at 487. Sitting as the "thirteenth juror," in a manifest weight argument, an appellate court reviews the entire record, weighs the evidence and all the reasonable inferences, considers the credibility of the witnesses, and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id.
 {¶ 62} With this standard in mind, we conclude that Shelton's convictions were not against the manifest weight of the evidence. Each of the sixteen witnesses who testified at trial were consistent in his or her account of the events. Janiera, Do.L, *Page 19 
M.L., T.L., D.F., and De.L. corroborated each other's version of the events. Although there were minor deviations in their testimony with respect to the timing of events, the color of the Cavalier, and the precise location of Shelton when Janiera entered her house, the deviations were not so incredible to conclude that the jury clearly lost its way and created a manifest miscarriage of justice.
 {¶ 63} Additionally, the testimony of Officer Ludrosky, Detective Belle, Officer Todd, Officer Harris, Officer Tusing, Donna Rose, Officer Brown, Detective Ealey, and Detective Freehoffer further supported Shelton's convictions.
 {¶ 64} The amount of reliable and consistent evidence presented by the state outweighed any inconsistencies in testimony and substantially supported each conviction. Thus, after reviewing the record, it is apparent that this is not one of those rare cases where the evidence weighs heavily against a conviction.
 {¶ 65} Therefore, Shelton's second assignment of error is also overruled.
 {¶ 66} In his third assignment of error, Shelton maintains that the trial court erred in sentencing him to consecutive terms of prison on several counts, without first considering concurrent sentences. He also asserts that the trial court did not make appropriate findings to justify consecutive sentences.
 {¶ 67} In State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, at paragraph two of the syllabus, the Supreme Court of Ohio held that R.C.2929.19(B)(2) no *Page 20 
longer requires judicial fact finding before a prison sentence is imposed within the appropriate range of 2929.14(A). The court also held that R.C. 2929.14(E)(4) no longer requires judicial fact finding before imposition of consecutive sentences. Id., paragraph four of the syllabus. Moreover, "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give reasons for imposing maximum, consecutive, or more than the minimum sentences." Id., at paragraph seven of the syllabus. Thus, the trial court had full discretion to impose consecutive sentences in the case at bar.
 {¶ 68} Additionally, Shelton contends that we are precluded from applying Foster because it violates the Ex Post Facto Clause, Section 10, Article I of the United States Constitution, and the Retroactivity Clause, Section 28, Article II of the Ohio Constitution, which in turn, violates his due process rights.
 {¶ 69} This court recently addressed this issue and rejected it inState v. Mallette, 8th Dist. No. 87984, 2007-Ohio-715. See alsoState v. Dawson, 8th Dist. No. 88485, 2007-Ohio-2761. InMallette, after a thorough analysis of federal and state law, we concluded:
 {¶ 70} "[Defendant] had notice that the sentencing range was the same at the time he committed the offenses as when he was sentenced.Foster did not judicially increase the range of his sentence, nor did it retroactively apply a new statutory maximum to an earlier committed crime, nor did it create the possibility of consecutive sentences where none existed. As a result, we conclude that the remedial holding ofFoster does not violate [appellant's] due process rights or the ex *Page 21 
post facto principles contained therein."[5]
 {¶ 71} Thus, Shelton's third assignment of error is overruled.
 {¶ 72} Accordingly, the judgment of the Cuyahoga County Court of Common Pleas is affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA A. BLACKMON, P.J., and ANN DYKE, J., CONCUR.
[1] Janiera identified Shelton in court.
[2] Because the children are minors their full names are not given.
[3] We note that in Shelton's brief argument here, he claims, "[t]he lack of credibility of all the testimony as a whole * * * makes the convictions here insufficient * * *." Shelton bases this contention on the wrong standard of law. In a sufficiency argument, credibility of the witnesses should never be considered. It is weight of the evidence that concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. See, State v. Thompkins (1997), 78 Ohio St.3d 380, 387.
[4] R.C. 2919.25(A), domestic violence, provides, "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."
R.C. 2903.11(A)(1), felonious assault, provides, "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * *."
R.C. 2911.11, aggravated burglary, provides, "(A)[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * *, when another person * * * is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply: (1)[t]he offender inflicts, or attempts or threatens to inflict physical harm on another; (2) [t]he offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control."
R.C. 2923.13(A)(2), having weapons while under disability, provides, "* * * no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply: * * * [t]he person is under indictment for or has been convicted of any felony offense * * *."
R.C. 2923.161(A)(1), improper discharging firearm at or into habitation, provides, "[n]o person, without privilege to do so, shall knowingly do any of the following: [discharge a firearm at or into an occupied structure that is a permanent or temporary habitation of any individual."
R.C. 2903.211(A)(1), menacing by stalking, provides, "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."
R.C. 2923.12, carrying concealed weapon, provides, "(A) [n]o person shall knowingly carry or have, concealed on the person's person or concealed ready at hand, any of the following: (1) [a] deadly weapon other than a handgun; (2) [a] handgun other than a dangerous ordnance; (3) [a] dangerous ordnance."
[5] In addition, we note that every other appellate district in the state of Ohio has reached the same conclusion. See State v. Bruce, 1st Dist. No. C-060456, 2007-Ohio-175; State v. Durbin, 2d Dist. No. 2005-CA-134; State v. McGhee, 3d Dist. No. 17-06-05, 2006-Ohio-5162;State v. Courtney, 4th Dist. No. 06CA18, 2007-Ohio-1165; State v.Paynter, 5th Dist. No. CT2006-0034, 2006-Ohio-5542; State v.Friess, 6th Dist. No. L-05-1307, 2007-Ohio-2030; State v.Haschenburger, 7 th Dist. No. 05MA192, 2007-Ohio-1562; State v.Newman, 9th Dist. No. 23038, 2006-Ohio-4082; State v. Gibson, 10th Dist. No. 06AP-509, 2006-Ohio-6899; State v. Elswick, 11th Dist. No. 2006-L-075, 2006-Ohio-7011; and State v. Andrews, 12th Dist. No. CA2006-06-142, 2007-Ohio-223. *Page 1