OPINION
{¶ 1} This timely appeal comes for consideration upon the record in the trial court, the parties' briefs, and their oral arguments before this court. Defendant-Appellant, Eric Jordan, appeals the decision of the Harrison County Court of Common Pleas that found him guilty of sexual assaults on two girls, AP and CA, and sentenced him accordingly. Jordan argues that an expert improperly opined on the veracity of the children, that he was improperly refused the opportunity to introduce evidence of a victim's sexual history, that his counsel was ineffective, and that his convictions are both not supported by sufficient evidence and against the manifest weight of the evidence. However, Jordan's arguments are meritless. The trial court's decision is affirmed.
 Facts {¶ 2} Jordan lived with his girlfriend, Christina Poch, for eight years prior to March 2005 with her sons, her daughter (AP), and a baby which had been placed in their custody. Christina was divorced from her children's father and Jordan acted as a stepfather to AP.
 {¶ 3} In March 2005, AP's friend, CA, stayed with the Poch family at Jordan's home over Easter weekend. On Saturday, March 26th, Christina bought her son a bottle of Bacardi 151 rum. On Monday, March 28th, Christina left for work and Jordan took AP to the home of another friend, KW, at 9:30. Jordan injured his shoulder during the day, saw Christina at her workplace at 2:00, and left the baby with a babysitter at 2:45 before seeking medical treatment at the hospital at 3:40.
 {¶ 4} CA testified that she stayed at Jordan's home while he took AP to KW's home, expecting her father to pick her up and take her out for the morning. She said her father never appeared and Jordan had her drink the Bacardi 151, performed oral sex on her, had her perform oral sex on him, and engaged in sexual intercourse with her. She testified that this occurred between 10:00 and 11:00 and that she laid down afterward. She stated that the baby was in the house at the time of the sexual assault, but was not present when she woke up. She then said that Jordan took her to KW's home at around 3:00.
 {¶ 5} Jordan testified that CA had stayed the night, but was not at his house when *Page 2 
he and AP left that Monday morning. He said that he went to his brother's home with the baby after leaving AP at KW's home and was there from 10:00 until 11:30. He then went back home with the baby until 12:45, when CA appeared and asked for a ride to KW's house. He took her there and arrived back home soon after 1:00. His sister-in-law then visited with a friend from 1:30 until 2:00. He then left to visit Christina at her work, took the baby to the babysitter, and sought medical attention.
 {¶ 6} That evening, Jordan picked AP and CA up from KW's and brought them to his home, where they stayed until school the next day. At school, CA reported the assault to a teacher. Both Children's Services and the police were notified. AP then told investigators that Jordan had sexually assaulted her three times between January and March 2005.
 {¶ 7} On May 6, 2005, the Harrison County Grand Jury filed a nine-count indictment against Jordan. That indictment charged him with the following offenses with regard to CA: 1) rape under R.C.2907.02(A)(2), rape under R.C. 2907.02(A)(1)(c), unlawful sexual conduct with a minor under R.C. 2907.04(A), and disseminating matter harmful to juveniles under R.C. 2907.31(A)(1). It then charged him with the following offenses with regard to AP: 1) rape under R.C. 2907.02(A)(2), rape under R.C. 2907.02(A)(1)(c), sexual battery under R.C.2907.03(A)(5). Finally, the indictment charged Jordan with the following offenses with regard to KW: 1) importuning under R.C. 2907.07(B) and 2) disseminating matter harmful to juveniles under R.C. 2907.31(A)(1).
 {¶ 8} The matter proceeded to a jury trial in February 2006. Before the matter was submitted to the jury, the State dismissed the charge alleging disseminating matter harmful to juveniles under R.C.2907.31(A)(1) with regard to KW. The jury then acquitted Jordan of three counts: 1) the rape against CA under R.C. 2907.02(A)(2), 2) the other count of disseminating matter harmful to juveniles, and 3) importuning. The trial court merged all of the offenses with regard to CA into one count of rape under R.C. 2907.02(A)(1)(c) for the purposes of sentencing and sentenced Jordan to eight years imprisonment. It then merged all of the offenses with regard to AP into one count of rape under R.C.2907.02(A)(2) for the purposes of sentencing and sentenced Jordan to ten *Page 3 
years imprisonment. It then ordered that Jordan serve these two terms of imprisonment consecutively, for a total of eighteen years.
 Foundation of Expert Opinion {¶ 9} In his first assignment of error, Jordan argues:
 {¶ 10} "The trial court erred in allowing Mr. Carrothers to testify Mr. Jordan raped AP and CA constituting prejudicial error because there was no foundational basis for Mr. Carrothers opinion in violation of Evid.R. 702(C)."
 {¶ 11} Jordan contends that the trial court erred when it allowed the social worker involved in the case, Demitrious Carrothers, to testify as an expert. He concedes that Carrothers had sufficient specialized knowledge, experience, and training to qualify him as an expert in the area of sexual abuse. However, he argues that Carrothers' opinions in this case were not based on reliable information and, therefore, it was improper for the trial court to allow Carrothers to express those opinions under Evid.R. 702.
 {¶ 12} The determination of the admissibility of expert testimony is within the discretion of the trial court and its decision will not be disturbed absent an abuse of that discretion. Valentine v. Conrad,110 Ohio St.3d 42, 2006-Ohio-3561, at ¶ 9. The phrase "abuse of discretion" connotes more than an error of law or judgment; it implies that the trial court acted unreasonably, arbitrarily, or unconscionably.State v. Adams (1980), 62 Ohio St.2d 151, 157.
 {¶ 13} Evid.R. 702 provides:
 {¶ 14} "A witness may testify as an expert if all of the following apply:
 {¶ 15} "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 {¶ 16} "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 {¶ 17} "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information."
 {¶ 18} "Most jurors would not be aware, in their everyday experiences, of how *Page 4 
sexually abused children might respond to abuse[, so] an expert's opinion testimony on whether there was sexual abuse would aid jurors in making their decision and is, therefore, admissible pursuant to Evid.R. 702 and 704." State v. Boston (1989), 46 Ohio St.3d 108, 128. Accordingly, there is no dispute regarding whether Carrothers' testimony relates to matters beyond the knowledge or experience possessed by lay persons. See Evid.R. 702(A). Likewise, Jordan concedes that Carrothers' credentials and experience qualify him as an expert under Evid.R. 702(B). The sole issue, then, is whether the testimony in question is reliable under Evid.R. 702(C).
 {¶ 19} The Ohio Supreme Court recently stated that the reliability of an expert's testimony depends on whether it "is based on scientifically valid principles and methods. A court should not focus on whether the expert opinion is correct or whether the testimony satisfies the proponent's burden of proof at trial. Accordingly, we are not concerned with the substance of the experts' conclusions; our focus is on how the experts arrived at their conclusions." (Citations omitted)Valentine at ¶ 16. Thus, the reliability of an expert's opinion rests on "the principles and methodology that underlie [that] opinion. * * * It is that determination that ensures that the testimony will be helpful to the trier of fact." Id. at 17.
 {¶ 20} In this case, Jordan does not challenge the principles and methodology underlying Carrothers' opinion. Instead, he challenges the reliability and correctness of the facts Carrothers relied upon when reaching his opinion. However, Valentine clearly says that the focus of Evid.R. 702(C) is on the reliability of the expert's methodology. Thus, Jordan's arguments concerning Carrothers' ability to testify as an expert is meritless.
 Expert's Opinion on Child's Truthfulness {¶ 21} In his second assignment of error, Jordan argues:
 {¶ 22} "Mr. Jordan was denied his constitutional right to a fair trial when the trial court allowed Mr. Carrothers to testify to the veracity of AP and CA's statements."
 {¶ 23} Jordan contends that Carrothers improperly bolstered the testimony of both CA and AP when he testified that he had "substantiated" the girls' claims of abuse. He *Page 5 
maintains that Carrothers' opinions were based almost solely on the girls' statements and, therefore, that his opinion was nothing more than an opinion on their veracity.
 {¶ 24} As acknowledged above, an expert can opine on whether he or she believes that a child has been sexually abused. Boston at 128. However, an expert cannot give an opinion of the veracity of the statements of a child declarant. Id. at syllabus. The Ohio Supreme Court has been careful to differentiate "between expert testimony that a child witness is telling the truth and evidence which bolsters a child's credibility."State v. Stowers, 81 Ohio St.3d 260, 262, 1998-Ohio-0632. The former is inadmissible, while the latter is perfectly permissible. Thus, an expert can testify that a child's behavior is consistent with the behavior of other children who had been sexually abused. Id.
 {¶ 25} We recently addressed whether an expert improperly opined on a child's truthfulness in State v. Schewirey, 7th Dist. No. 05 MA 155,2006-Ohio-7054. In that case, a doctor examined a child for sexual abuse, but could not make any physical findings. Nevertheless, the doctor diagnosed the child as a sexually abused child. On cross-examination, the doctor admitted that her diagnosis was based solely on the story related to her by the child.
 {¶ 26} We held that the doctor's opinion in that case was "nothing more than an opinion on the veracity of Child M's allegations" since it was based on nothing more than what the child told her. Id. at ¶ 51. However, we clarified that "an expert does not need physical findings to reach a diagnosis. If the expert relies on other facts in addition to the child's statements, then the expert's opinion will not be an improper statement on the child's veracity." Id. at ¶ 50.
 {¶ 27} In this case, Carrothers testified that he concluded that CA's allegations of sexual abuse were "substantiated." He gave the following factors as the basis for this conclusion:
 {¶ 28} "The primary one was the information I had received from Southeastern Ohio Regional Medical Center by Dr. Dayton and Ms. Hill. Second was the statements that CA had given me in regards to the adult known to her, private's, his penis, and his methodology of how he liked to have intercourse was also corroborated by Ms. Poch. *Page 6 
And those kind of details should be unknown to a child that hadn't had sexual relations with that person."
 {¶ 29} Carrothers also "substantiated" AP's allegations. He relied on the following facts to make this decision:
 {¶ 30} "With AP's, the crux there was the details of her statement. Unfortunately there wasn't the physical evidence but the details which she provided, her emotional state during the disclosure, her body language during the disclosure, all very consistent with other substantiated cases of sexual abuse that I've dealt with. And that combined with the sister case with CA my supervisor and I both sat down and discussed it and determined substantiated sexual abuse was warranted in this case."
 {¶ 31} This testimony shows that Carrothers based his opinion on more than the girls' allegations. He relied on the results of the physical examination of CA, the physical descriptions of Jordan's male anatomy, the girls' demeanor, and his past experience of dealing with many sexually abused children. Accordingly, his opinion may have bolstered the girls' credibility, but he did not give an opinion on their veracity.
 {¶ 32} Finally, the trial court ameliorated any hint that "substantiating" the allegations was evidence that they were true. It instructed the jury as follows:
 {¶ 33} "You will recall this morning that Mr. Carrothers from the Department of Job and Family Services testified and he testified concerning findings that they made in their agency, substantiated, unsubstantiated or indicating allegations of abuse. I'm instructing you that the findings they make at the agency are completely separate from the findings that you'll be asked to make in this case. Those are administrative matters. And I will be giving you instructions — as I've said before I will be giving you instructions as to exactly what matters you have to find, you have to address. So I want you to be aware of that and I'm giving you that to assist you in keeping your mind open and understanding the full scope of what you'll be asked to do."
 {¶ 34} For all these reasons, Jordan's second assignment of error is meritless. *Page 7 
 Prosecutorial Misconduct {¶ 35} In his third assignment of error, Jordan argues:
 {¶ 36} "Mr. Jordan was denied his constitutional rights to due process and a fair trial when the prosecutor engaged in misconduct by stating, without any evidentiary basis during, closing argument, that Mr. Carrothers, who is trained to investigate sexual abuse cases, believed CA and AP were telling the truth bolstering the victims' testimony."
 {¶ 37} Jordan contends that the prosecutor committed misconduct by stating in closing argument that Carrothers had "substantiated" CA's and AP's allegations of sexual abuse.
 {¶ 38} A prosecutor cannot express his or her personal belief or opinion as to the credibility of a witness. State v. Smith (1984),14 Ohio St.3d 13, 14. But a prosecutor may relate the facts the jury is entitled to consider when evaluating a witness's credibility. State v.Watson (1991), 61 Ohio St.3d 1, 10.
 {¶ 39} In this case, the prosecutor merely repeated the evidence properly admitted into trial when he noted that Carrothers had "substantiated" the girls' allegations of sexual abuse. He stated as follows:
 {¶ 40} "You heard from Demi Carrothers, Department of Job and Family Services, lead investigator on sexual assault cases. He substantiated sexual abuse in CA's case based on the injuries she received reported by Dr. Dayton, based on her demeanor at the time that he interviewed her, and based upon the statements that she made that were consistent with other sexual abuse cases that he's investigated.
 {¶ 41} "He substantiated sexual abuse in AP's case based upon her statements, her demeanor, the fact that she gagged during the interview while she described what the defendant did to her."
 {¶ 42} As can be seen, the prosecutor never expressed his personal belief on the credibility of either of the girls. Accordingly, Jordan's third assignment of error is meritless.
 Rape Shield {¶ 43} In his fourth assignment of error, Jordan argues: *Page 8 
 {¶ 44} "The trial court erred in refusing to allow the testimony of another witness concerning the past sexual activity of the victim, offered to refute AP's direct testimony she was a virgin."
 {¶ 45} Jordan claims the Rape Shield Law does not apply in this case since CA testified that she was a virgin at the time of the rape, thereby opening the door to impeach her with evidence of her prior sexual activity. The State argues the trial court's decision was correct because Jordan attempted to introduce the evidence of CA's prior sexual activity through another witness, rather than through cross-examination of CA herself.
 {¶ 46} R.C. 2907.02(D), commonly known as Ohio's Rape Shield Law, provides:
 {¶ 47} "Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."
 {¶ 48} "The statute essentially prohibits the introduction of any extrinsic evidence pertaining to the victims' prior sexual activity [since t]he only exceptions to this prohibition involve `evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender.'" State v. Hart (1996), 112 Ohio App.3d 327,331. The Ohio Supreme Court has found that "[s]everal legitimate state interests are advanced by the shield law. First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process." State v. Gardner (1979), 59 Ohio St.2d 14,18-19. "It is within the sound discretion of the trial court to determine the relevancy of evidence and to apply R.C. 2907.02(D) to best meet the purpose of the statute." Hart at 331.
 {¶ 49} Jordan argues that the State waives application of the Rape Shield Law if it *Page 9 
asks a victim about her sexual history. However, the doctrine of waiver does not apply to this situation.
 {¶ 50} In Gardner, the defendant challenged the constitutionality of the Rape Shield Law, arguing that it prevented him from confronting the witnesses against him. In that case, the victim claimed, on cross-examination, that she had never engaged in prostitution. The defendant then attempted to call a witness who would testify that the victim had solicited sex from him. Citing Chambers v. Mississippi
(1973), 410 U.S. 284, the Ohio Supreme Court held that courts must "balance the state interest which the statute is designed to protect against the probative value of the excluded evidence." Id. at 17. "The key to assessing the probative value of the excluded evidence is its relevancy to the matters as proof of which it is offered." Id. at 18. It concluded that "[e]vidence that complaintant had a reputation as a prostitute is not sufficiently probative of consent to outweigh the state's legitimate interests in excluding the testimony, at least where there is no suggestion in the record that financial arrangements were entered into for sexual activities in this instance." Id.
 {¶ 51} In State v. Williams (1984), 16 Ohio App.3d 484, a case cited by Jordan as applying the doctrine of waiver, the court applied this balancing test. In Williams, the victim testified on direct examination that she was a lesbian and the defense sought to introduce evidence that she had had prior sexual relations with a man. The trial court refused to allow this evidence to be introduced but the appellate court reversed that decision. The court noted that the state's interests in the Rape Shield Law had to be balanced against the defendant's right to confront the witnesses against him.
 {¶ 52} "It is clear that in the instant case the prosecution is relying on the fact that the victim claims to be a lesbian as proof that she would never have consensual sexual relations with any man and that therefore she did not consent to sexual relations with appellant. This testimony was elicited by the prosecution on direct examination. The evidence is clearly substantially material, relevant and probative as to the element of force or threat of force in consummating the admitted sexual activity. As we have noted, supra, consent is the fundamental issue in the case at bar. *Page 10 
 {¶ 53} "The evidence proffered by appellant would tend to show that the victim was lying when she said she was a lesbian and had never had consensual sexual relations with any man and that therefore she did not consent in the case sub judice. This evidence would go to the very heart of the issue of consent, the only issue contested at trial. The refusal to allow appellant to present evidence which is so highly probative, relevant and material as to an element of the crime violated his Sixth Amendment rights to confront the witnesses against him." Id. at 490.
 {¶ 54} Thus, Williams did not resort to the doctrine of waiver when it allowed this type of evidence to be introduced. Instead, it used a balancing test to balance the state's interests embodied in the Rape Shield Law against the defendant's rights.
 {¶ 55} The second case cited by Jordan, State v. Hodge (Aug. 17, 1992), 12th Dist. No. CA91-10-181, does say that the Rape Shield Law was "waived," but discusses this in a much different context than the present case. In Hodge, the defendant argued that the prosecution improperly introduced evidence of the victim's virginity. He claimed that this evidence was merely designed to inflame the jury into convicting him. There is no suggestion that the defendant tried to demonstrate that the victim had not been a virgin at the time of the offense.
 {¶ 56} In Hodge, the court noted that the Rape Shield Law was designed to protect the victim, not the accused. It then concluded that thedefendant had waived any objection to the admission of this evidence since he first broached the topic of the victim's virginity during his opening statement.
 {¶ 57} The situation in this case is much different. Here, Jordan is arguing that the State has waived any challenge to his use of CA's sexual history. However, this was not the issue in Hodge and not the analysis adopted in Gardner.
 {¶ 58} We conclude that the trial court did not abuse its discretion when excluding this evidence. Jordan clearly has an interest in his right to confront the witnesses against him. However, the State also has the interests embodied in the Rape Shield Law. The balance of those interests in this particular case is similar to that inGardner. Here, the issue being disputed was not really consent; rather it was whether Jordan and CA actually *Page 11 
engaged in sexual conduct. CA's sexual history has no apparent bearing on this issue. Thus, Jordan's only interest in introducing this evidence is to impeach CA by showing that a largely irrelevant portion of testimony is possibly untruthful. The State's legitimate interests in the things protected by the Rape Shield Law in this case more than balances Jordan's interest in putting this single bit of impeaching evidence before the jury. Accordingly, we cannot conclude that the trial court abused its discretion when it excluded this evidence. Jordan's arguments in his fourth assignment of error are meritless.
 Ineffective Assistance of Counsel {¶ 59} In his fifth assignment of error, Jordan argues:
 {¶ 60} "Mr. Jordan was denied his constitutional guarantee of effective assistance of counsel."
 {¶ 61} To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate counsel's performance was deficient and that deficient performance prejudiced the defense. Strickland v.Washington (1984), 466 U.S. 668, 687. Ineffectiveness is demonstrated by showing counsel's errors were so serious that he or she failed to function as the counsel guaranteed by the Sixth Amendment. State v.Hamblin (1988), 37 Ohio St.3d 153, 156. To establish prejudice, a defendant must show there is a reasonable possibility that, but for counsel's errors, the result of the proceeding would have been different. Strickland at 694. A reasonable probability must be a probability sufficient to undermine confidence in the outcome of the case. State v. Bradley (1989), 42 Ohio St.3d 136, paragraph three of the syllabus. The defendant bears the burden of proof in demonstrating ineffective assistance of counsel. Smith at 100. Generally, the decision whether or not to call a witness is a trial tactic which will not sustain a claim of ineffective assistance of counsel. State v.Payton (1997), 124 Ohio App.3d 552, 558.
 {¶ 62} At trial, a technician from the Ohio Bureau of Criminal Investigation tested CA's underwear and a rug in AP's room for DNA. She detected DNA on the rug, testified that the DNA matched Jordan, and testified that "the expected frequency of occurrence of the DNA profile identified in the sperm fraction of the cutting from the rug is one in one *Page 12 
hundred and twenty-nine quadrillion one hundred trillion individuals."
 {¶ 63} That same technician could not detect any male DNA on CA's underwear, but found that one pair contained seminal fluid. She testified that there were more sensitive tests than she had available to her to test seminal fluid for DNA. Accordingly, the sample was sent to another lab for this other test. The technician from the other lab testified that this new test is "a little more sensitive" than the test run at the first lab, which meant that he could get results from either less or lower quality DNA. That test "could not exclude [Jordan] as a contributor to the DNA in that sample."
 {¶ 64} On appeal, Jordan argues that his defense counsel should have called an expert to testify on his behalf since "this new testing procedure can produce results with weaker samples it can also pick up trace amounts of DNA." The problem with this argument is that the facts Jordan relies on (the fact that this test may produce unreliable results) are not in the trial record. Instead, they are from an article written for the National Association of Criminal Defense Lawyers which is attached to Jordan's appellate brief. "[W]hen a defendant makes a claim of ineffective assistance of counsel based upon facts outside the record, the appropriate remedy is a petition for postconviction relief."State v. Tackett, 11th Dist. No. 2003-A-0091, 2004-Ohio-6705, at ¶ 19.
 {¶ 65} All of Jordan's arguments are based on the facts in that article and none of those facts are in the record. Based on the evidence in the record, we cannot conclude either that Jordan's counsel acted deficiently or that his conduct prejudiced Jordan in any way. Accordingly, Jordan's fifth assignment of error is meritless.
 Sufficiency of the Evidence {¶ 66} In his sixth assignment of error, Jordan argues:
 {¶ 67} "There was insufficient evidence to convict Mr. Jordan of rape because the State failed prove [sic] each and every element of the charged offenses beyond a reasonable doubt."
 {¶ 68} "Sufficiency of the evidence" is "`a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" State v. *Page 13 Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-0052, quoting Black's Law Dictionary (6 Ed.1990) 1433. The relevant inquiry when determining whether the evidence is sufficient to support the verdict "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus. "The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of facts." Id. at 273. Whether the evidence is legally sufficient is a question of law.Thompkins at 386.
 {¶ 69} Jordan was convicted of five different charges and challenges the sufficiency of the evidence supporting each of these convictions. We will address those issues in the order from the less serious offenses to the more serious offenses.
 Unlawful Sexual Conduct with a Minor R.C. 2907.04(A) and R.C. 2907.03(A)(5) {¶ 70} In the third count of the indictment, Jordan was charged with unlawful sexual conduct with a minor, CA, under R.C. 2907.04(A) and the jury found him guilty of this offense. That statute provides:
 {¶ 71} "No person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard." R.C. 2907.04(A).
 {¶ 72} The seventh count in the indictment charged Jordan with a sexual battery of AP under R.C. 2907.03(A)(5), which provides:
 {¶ 73} "No person shall engage in sexual conduct with another, not the spouse of the offender, when * * * [t]he offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person."
 {¶ 74} Jordan contends that there is insufficient evidence of sexual conduct between he and either CA or AP to support these convictions. "`Sexual conduct' means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus *Page 14 
between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).
 {¶ 75} In this case, there is clearly sufficient evidence, when it is viewed in the light most favorable to the State, to support these convictions. CA testified that Jordan performed cunnilingus on her, that she performed fellatio on him, and that the two engaged in sexual intercourse. AP testified that Jordan performed cunnilingus on her, that she performed fellatio on him, and that the two engaged in sexual intercourse. This is clearly evidence of sexual conduct. Jordan's arguments to the contrary are meritless.
 Rape — Psychological Force Element R.C. 2907.02(A)(2) {¶ 76} In the indictment's fifth count, Jordan was charged with raping AP under R.C. 2907.02(A)(2) and the jury found him guilty of this offense. R.C. 2907.02(A)(2) defines rape as follows:
 {¶ 77} "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."
 {¶ 78} Jordan contends that the State failed to introduce sufficient evidence to prove that he used force or the threat of force when engaging in sexual conduct with AP. His argument is contradicted by the record.
 {¶ 79} "`Force' means any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C.2901.01(A). Force and threat of force "can be inferred from the circumstances surrounding sexual conduct." State v. Schaim,65 Ohio St.3d 51, 1992-Ohio-0031, paragraph one of the syllabus. The forcible element is established where a defendant's actions create "the belief that physical force will be used if the victim does not submit" to the defendant's actions. Id. "A victim need not prove physical resistance to the offender" for a defendant to be found guilty of rape. R.C.2907.02(C). "However, in order to prove the element of force necessary to sentence the defendant to life imprisonment, the statute requires that some amount of force must *Page 15 
be proven beyond that force inherent in the crime itself." State v.Dye, 82 Ohio St.3d 323, 327, 1998-Ohio-0234.
 {¶ 80} In this case, there is little evidence that Jordan used or threatened physical force to compel AP to submit to sexual conduct. She testified that in the first incident Jordan "took my pants off * * * and he started eating me out," that he "made me give him head," that "he started having sex with me," and that "he put me in different positions" while they had sex. During the second incident he "made me eat him out and give him head and once again he started having sex with me, put me in different positions." At the third incident, Jordan "made me give him head." At none of these times, does AP describe the use or threat of physical force beyond that force inherent in the crime itself.
 {¶ 81} These facts are reflected in the trial court's instructions to the jury. The trial court used the statutory definition of force when defining that term for the jury with regard to Jordan's alleged rape of CA under R.C. 2907.02(A)(2), an offense for which he was acquitted, but used a different definition of force when defining that term with regard to the rape of AP under R.C. 2907.02(A)(2). When instructing the jury on that offense, the trial court said as follows:
 {¶ 82} "Force means any violence, compulsion, or constraint exerted or used by any means against a person or thing.
 {¶ 83} "When the relationship between a victim and the perpetrator is one of a child and a parent or similar relationship, the element of force need not be openly displayed or physically brutal. It can be subtle, slight, and psychologically or emotionally powerful.
 {¶ 84} "If you find beyond a reasonable doubt that such relationship existed and under the circumstances in evidence the victim's will was overcome by fear or duress or intimidation, the element of force has been proved."
 {¶ 85} This definition of force has been called "psychological force" and was first used in State v. Eskridge (1988), 38 Ohio St.3d 56. InEskridge, a father engaged in sexual conduct with his four year old child, but could not be sentenced to life unless the state could show that he used force to compel the victim to submit to the conduct. The *Page 16 Eskridge court concluded that there was evidence of force, noting that "[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's will was overcome by fear or duress, the forcible element of rape can be established." Id. at 58-59. It held that such force was present in that case because of the power a parent holds in a parent-child relationship. "The youth and vulnerability of children, coupled with the power inherent in a parent's position of authority creates a unique situation of dominance and control in which explicit threats and displays of force are not necessary to effect the abuser's purpose." Id. at 59. Accordingly, the court ultimately held:
 {¶ 86} "The force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength." Id. at paragraph one of the syllabus.
 {¶ 87} The Ohio Supreme Court revisited the issue in State v.Dye, 82 Ohio St.3d 323, 1998-Ohio-0234, and extended Eskridge's basic holding to any adult who was in "[a] person in a position of authority over a child under thirteen." Id. at syllabus. When doing so, the Court recognized that relationships other than parent-child relationships may contain this same obligation of obedience since non-parent caregivers can occupy "the same position of authority as the parent traditionally would." State v. Dye, 82 Ohio St.3d 323, 329, 1998-Ohio-0234.
 {¶ 88} However, the Ohio Supreme Court has placed limits on when theEskridge definition of "psychological force" can be used, even when the alleged perpetrator is a parent. In State v. Schaim, 65 Ohio St.3d 51, 1992-Ohio-0031, the victim said her father had subjected her to a pattern of sexual abuse that began when she was a preteen and continued until she was twenty years old. The Court found that Eskridge did not apply since the victim was an adult.
 {¶ 89} "State v. Eskridge is based solely on the recognition of the amount of control that parents have over their children, particularly young children. Every detail of a *Page 17 
child's life is controlled by a parent, and a four-year-old child knows that disobedience will be punished, whether by corporal punishment or an alternative form of discipline. Because of the child's dependence on his or her parents, a child of tender years has no real power to resist his or her parent's command, and every command contains an implicit threat of punishment for failure to obey. Under these circumstances, a minimal degree of force will satisfy the elements of forcible rape. Id., paragraph one of the syllabus.
 {¶ 90} "The same rationale does not apply to an adult. No matter how reprehensible the defendant's alleged conduct, a woman over the age of majority is not compelled to submit to her father in the same manner as is a four-year-old girl. She is no longer completely dependent on her parents, and is more nearly their equal in size, strength, and mental resources. Although we are aware of the devastating effects of incest on its victims, and are sympathetic to the victim whose will to resist has been overcome by a prolonged pattern of abuse, we reluctantly conclude that a pattern of incest is not always a substitute for the element of force required by R.C. 2907.02(A)(2)." Id. at 55.
 {¶ 91} Since Dye's syllabus limits its application to children under the age of thirteen and Schaim states that Eskridge is based on "the amount of control that parents have over their children, particularly young children," defendants have challenged whether the definition of "psychological force" can be used in cases involving children aged thirteen or older. See State v. Milam, 8th Dist. No. 86268,2006-Ohio-4742 (Thirteen year-old victim); State v. Nieland, 2d Dist. No. 2005-CA-15, 2006-Ohio-0784 (Fifteen to sixteen year-old victim);State v. Dippel, 10th Dist. No. 03AP-448, 2004-Ohio-4649 (Fourteen year-old victim); State v. Oddi, 5th Dist. No. 02CAA01005, 2002-Ohio-5926 (Fifteen year-old victim); State v. Musgrave (Nov. 25, 1998), 9th Dist. No. 18260 (Thirteen year-old victim). In fact, this court just released an opinion in which a defendant made the same argument. See State v. Haschenburger, 7th Dist. No. 05 MA 192,2007-Ohio-1562 (Fourteen to sixteen year-old victim). Each of these courts have rejected this argument, noting among other things, that the reasons underlying the Eskridge rationale can apply to teenagers as well as to preteens. Haschenburger at ¶ 44; Milam at ¶ 12; *Page 18 Musgrave at 8-9. It should further be noted that Dye had to be limited to applying to cases involving children younger than thirteen because it was dealing with a force specification under R.C. 2907.02(A)(1)(b), which only applies to cases involving preteen children. InHaschenburger, this court found that in cases involving perpetrators in a position of authority and teenagers, force is proven if the victim's will was overcome by fear or duress. Id. at 44.
 {¶ 92} In this case, AP testified that she acquiesced to Jordan's sexual demands because she was "scared" that Jordan "would get me in trouble." She said that he had previously taken her to the Jefferson County Jail, where she was locked up for a short while, after she had been caught smoking and that she thought this might happen again.
 {¶ 93} This evidence, when viewed in the light most favorable to the State, is sufficient to show that AP's will was overcome by fear of what Jordan, a person in a position of authority over her, would do if she did not comply. Accordingly, the State has presented sufficient evidence to prove that Jordan used or threatened force to compel AP to submit to the sexual conduct. Jordan's arguments to the contrary are meritless.
 Rape — Substantially Impaired Element R.C. 2907.02(A)(1)(c) {¶ 94} In its second and sixth counts, the indictment charged Jordan with raping AP and CA under R.C. 2907.02(A)(1)(c) and the jury found him uilty of these offenses. R.C. 2907.02(A)(1)(c) provides:
 {¶ 95} "No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when * * * [t]he other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age, and the offender knows or has reasonable cause to believe that the other person's ability to resist or consent is substantially impaired because of a mental or physical condition or because of advanced age."
 {¶ 96} Jordan claims that the State failed to prove that he committed these offenses because it failed to show that the girls' ability to resist or consent was *Page 19 
substantially impaired.
 {¶ 97} The Ohio Supreme Court had held that "substantial impairment must be established by demonstrating a present reduction, diminution or decrease in the victim's ability, either to appraise the nature of his conduct or to control his conduct. This is distinguishable from a general deficit in ability to cope, which condition might be inferred from or evidenced by a general intelligence or I.Q. report." State v.Zeh (1987), 31 Ohio St.3d 99, 104. "`Substantial impairment' need not be proven by expert medical testimony; it may be proven by the testimony of persons who have had some interaction with the victim and by permitting the trier of fact to obtain its own assessment of the victim's ability to either appraise or control her conduct." State v. Hillock, 7th Dist. No. 02-538-CA, 2002-Ohio-6897, at ¶ 21.
 {¶ 98} In this case, CA testified that Jordan offered her a full bottle of Bacardi 151. CA testified that she was "pretty sure I drank all of it, but I'm not real sure." She testified that this made her "very" drunk. After CA drank the alcohol, Jordan engaged in sexual conduct with her.
 {¶ 99} CA's testimony is clearly sufficient, when viewed in the light most favorable to the State, to establish that Jordan knew her ability to resist would be substantially impaired. According to CA's testimony, Jordan plied her with liquor until she was drunk and then engaged in sexual conduct with her. Jordan's argument that the State failed to present evidence on this element of the offense is meritless.
 {¶ 100} The same holds true regarding the evidence supporting the conviction for the rape against AP. AP testified that Jordan "had me drink cranberry — either cranberry or raspberry vodka" before engaging in sexual conduct with her. It would be reasonable for a jury to conclude that vodka would substantially impair a fourteen year-old's ability to resist sexual advances.
 {¶ 101} There is sufficient evidence supporting each of Jordan's convictions under R.C. 2907.02(A)(1)(c). Jordan's arguments to the contrary appear to be meritless. Since each of Jordan's arguments about the sufficiency of the evidence supporting his convictions is meritless, his sixth assignment of error as a whole is meritless. *Page 20 
 Manifest Weight of the Evidence {¶ 102} In his seventh assignment of error, Jordan argues:
 {¶ 103} "Mr. Jordan's conviction was against the manifest weight of the evidence violating his constitutional rights."
 {¶ 104} The legal concept of the weight of the evidence is both quantitatively and qualitatively different than sufficiency of the evidence. Thompkins at paragraph two of the syllabus. When reviewing whether a conviction was against the manifest weight of the evidence, this court must "examine whether the evidence produced at trial `attains the high degree of probative force and certainty required of a criminal conviction.'" State v. Tibbetts, 92 Ohio St.3d 146, 163, 2001-Ohio-0132, quoting State v. Getsy, 84 Ohio St.3d 180, 193, 702 1998-Ohio-0533. In order to do this, we must examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the fact-finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id. "`Weight is not a question of mathematics, but depends on its effect in inducing belief.'" (Emphasis sic.) Thompkins at 387, quoting Black's Law Dictionary (6 Ed.1990) 1594.
 {¶ 105} Jordan makes the same arguments regarding the manifest weight of the evidence supporting his convictions that he made when arguing that those convictions were supported by insufficient evidence. For purposes of our analysis, we will group the offenses into offenses against CA and offenses against AP. Furthermore, we will describe all the testimony before addressing whether any of these offenses are against the manifest weight of the evidence.
 {¶ 106} CA, who was born on May 15, 1990, testified that she and AP were best friends and that she spent the Easter weekend in 2005 at AP's home. CA spent "a lot" of time at AP's home, was there "almost every weekend," and knew that Jordan lived in AP's household. On the Monday after Easter, March 28th, Jordan told CA that her father was coming to pick her up. CA was excited about this, since her "dad's not always there," and stayed at AP's home while Jordan took AP to the home of a mutual friend of both AP and CA, KW. According to CA, Jordan left with AP between 9:00 and 9:30 in the morning and *Page 21 
that he returned about thirty minutes later. She claimed that Jordan left a baby in the house with CA while he was gone.
 {¶ 107} After he returned, Jordan put the baby to bed, retrieved a bottle of Bacardi 151, and insisted that she drink the alcohol. She testified that she was "pretty sure I drank all of it but I'm not real sure," which made her "very" drunk. She then testified that Jordan began playing a pornographic movie for her in the living room. After the movie began, Jordan undressed CA and himself, so that CA was naked and he was just wearing a white shirt. He then put her down on a love seat and started to perform cunnilingus on her. After he finished, Jordan grabbed CA's arms, pulled her up, stuck his penis in her face, and told her, "Do this." CA described Jordan's erect penis as "about eight and a half, nine inches" and "a darker color." She stated that she refused to perform fellatio, though Jordan did place his penis in her mouth once.
 {¶ 108} After this, Jordan drug CA upstairs to AP's room. He "threw" CA onto the bed and "flipped" her onto her hands and knees. Jordan then placed his penis in CA's vagina while she faced away from him. After a few minutes, Jordan "flipped" CA onto her back and reinserted his penis into her vagina. She tried to push him away, but he said, "A few more minutes." Eventually, Jordan pulled his penis out of CA and manually stimulated himself until he ejaculated on CA's chest and face. He then left the room and CA blew her nose on the rug, since some of Jordan's ejaculate had gone up her nose. She then laid down in the bed "for a while." CA testified that she believed this all occurred between 10:00 and 11:00.
 {¶ 109} A bit later, CA woke up, "stumbled" downstairs, got dressed, and laid down on the couch. She states that the baby was not in the home at this time, even though it was at the time of the sexual conduct, and that she doesn't know what happened to it. CA began to vomit and Jordan got her a bucket to vomit into. He then gave her some of AP's clothes to change into. After she was changed, he drove her to KW's house. She believes she arrived at KW's between 2:30 and 3:00, although she was not certain of the time. CA told AP what happened and AP advised that she not say anything. The two girls were later picked up by Jordan as they were walking to another *Page 22 
friend's home. Jordan had been cut and was going to the hospital. That night, CA spent the night at AP's again and went to school with AP the next morning.
 {¶ 110} At school, CA told a teacher what had happened and that teacher referred her to the school's guidance counselor. The guidance counselor then contacted Department of Children and Family Services and Carrothers began his investigation. After school, CA told her mother what happened and was taken to a hospital, where medical personal examined her and completed a rape kit.
 {¶ 111} On cross-examination, defense counsel demonstrated some discrepancies between CA's description of the clothes she was wearing and the clothing put into evidence. She also denied that Jordan found drugs on the girls that evening when he stopped to pick them up on his way to the hospital.
 {¶ 112} The State's second witness was Duane Winston, a technician with a forensic laboratory that performed the more sensitive DNA testing on the seminal fluid on CA's underwear. He testified that neither the DNA on the underwear nor Jordan's genetic markers did not match those of the 4,004 people in the company's database. Furthermore, he could not exclude Jordan as the person who contributed that genetic sample. However, Winston clarified that this applied to all of Jordan's male paternal relatives as well.
 {¶ 113} Dr. David Schaffer is an emergency room physician at Harrison Community Hospital. He testified that Jordan came into the hospital at 3:40 and was treated for an injury to his shoulder.
 {¶ 114} Raymond Hibbs was the State's fourth witness. He was one of CA's teachers and testified that her appearance was noticeably different on March 29, 2005, than her normal appearance. She told him that she had something personal to talk about and he asked a neighboring female teacher, Patricia Knoop, to be present. CA then told the two teachers that she had been raped. Hibbs watched the classes while Knoop took CA to the guidance office. Knoop corroborated Hibbs's testimony.
 {¶ 115} Pamela Tope, the guidance counselor at CA's school, corroborated Hibbs's testimony about CA's appearance on March 29, 2005. When Knoop brought CA *Page 23 
to Tope, CA told her she had been sexually violated and Tope contacted Children Services.
 {¶ 116} The State's next witness was KW. She confirmed that Jordan brought AP to KW's home on the morning of March 28th and said she didn't see anyone with Jordan at that time. She said CA arrived at her house between 3:00 and 4:00 and was dropped off by Jordan. CA was "a mess" and "looked like she had been crying." Eventually, CA told her and AP that she had been sexually assaulted by Jordan. KW testified that Jordan picked AP and CA up from her house later that evening.
 {¶ 117} Shawna Everhart is AP's aunt and testified that Jordan stopped by her house at about 2:45 on March 28, 2005, and asked her to watch the baby. Jordan returned at about 6:00 to retrieve the baby. He told her he was dropping the baby off so he could have the cut on his arm seen to by a doctor.
 {¶ 118} The State next called two technicians from the Ohio Bureau of Criminal Identification and Investigation, Russell Edelheit and Stacy Violi. Edelheit testified that he found seminal fluid on a pair of CA's underwear and trace amounts of semen on the rug in AP's room. Viola testified that she could not recover any DNA from CA's underwear and that this was sent to an outside lab for further testing. She further testified that there was a one in one hundred and twenty-nine quadrillion one hundred trillion chance that the semen on the rug did not belong to Jordan.
 {¶ 119} Lucinda Hill was the nurse who collected the rape kit from CA. She testified that CA told her that she was sexually assaulted after she was told to drink a large amount of alcohol. Hill discovered bruising in and around CA's vagina. She said these injuries were consistent with injuries she had seen in other sexual assault cases and consistent with the conduct CA had described. The doctor who examined CA at the hospital, Dr. Michelle Dayton, echoed these conclusions.
 {¶ 120} The local police chief testified that he was told of the sexual assault on CA on March 29th and interviewed the child with Carrothers for about an hour. He testified that CA appeared "very flustered" and "very distraught." As a result of that interview, the police arrested Jordan and searched his home. He and Carrothers then *Page 24 
interviewed Jordan, who told them to "prove" that he committed the alleged acts.
 {¶ 121} Carrothers testified that he works for the Department of Job and Family Services and is primarily responsible for investigating allegations of child abuse and neglect. He became involved in this case on March 29th when his agency received a report that CA had allegedly been sexually assaulted. Carrothers first contacted CA's mother and the police to arrange a videotaped interview. After the interview, Carrothers advised CA's mother to take her to the hospital for a sexual assault examination. Carrothers then accompanied the police when they arrested Jordan, searched his home, and interviewed him. Carrothers testified that Jordan denied the allegations and dared the interviewers to "prove it." Jordan admitted CA was at his house at about 1:30 and that he took her to KW's home, but states that he had not been home at the time of the alleged incident.
 {¶ 122} Carrothers also arranged an interview with AP. He testified that she appeared frightened and that she cried during the interview. AP described three different instances and she gagged when describing these incidents. Based on the evidence collected in the investigations of these allegations, particularly the descriptions of Jordan's genitalia, Carrothers substantiated both allegations of abuse.
 {¶ 123} On cross-examination, Carrothers stated that he investigated domestic abuse allegations against Jordan with regard to AP in March 2004. He could not substantiate the allegations of physical abuse at that time. Carrothers also acknowledged that he had investigated prior allegations of sexual abuse involving Jordan and AP, but clarified that AP had not made those allegations. After speaking with AP, Carrothers did not upgrade those allegations.
 {¶ 124} CA's mother confirmed that CA told her of the allegations after she got home from school on March 29th. Based on this information, she called Carrothers and brought CA in for an interview.
 {¶ 125} AP's mother, Christina, testified that Jordan had been her live-in boyfriend for eight years by March 2005. Earlier in March, Jordan had transferred the home into her name. Christina said that he did this because creditors were threatening to *Page 25 
place a lien on the home. Christina testified that Jordan put it her name because "he didn't trust anybody but me with it." Christina had not owned a home before this since her divorce from her ex-husband. Christina stated that she had bought her son a bottle of Bacardi 151 on Saturday, March 26, 2005, the day before Easter.
 {¶ 126} On March 28th, she left for work at about 8:00 in the morning. According to Christina, CA had stayed at their home over Easter weekend and was present when she left for work. When Christina left, she forgot to take a lunch box to one of her sons.
 {¶ 127} At about 11:30, Jordan called her at work to tell her he had cut his arm on a nail, that he thought he might need stitches, and that he needed someone to watch the baby. He then stopped by Christina's work at about 2:00 to show her his arm. She said he seemed "in a hurry to leave" and had the baby with him at this time. The next time Christina saw Jordan was around 6:00, when he arrived home with both of the girls. Christina testified that CA did not have makeup on when they all arrived home, which was unusual, and that it appeared that she had been crying. She also testified that Jordan followed everyone around that night and smoked excessively, two behaviors which were not normal for him.
 {¶ 128} On March 29th, Jordan was doing laundry and burning garbage in the back yard when Christina came home. That laundry included some of her laundry and some of AP's, but none of Christina's son. Christina felt this was odd. Jordan also washed the sheets from AP's bed. Later, the police arrived to search the home and arrest Jordan. It was at this time that Christina learned of the alleged sexual assaults.
 {¶ 129} Christina further testified that she had forbidden AP from seeing a boy named Gary Woodard "because he was gothic" and smoked cigarettes. She did not know on March 28th that Gary Woodard smoked marijuana, but learned of this fact afterward.
 {¶ 130} Christina was asked about her sex life with Jordan. She testified that his favorite position was when she was on her knees with him behind her. She stated he also liked oral sex and to stand up with her on him. Finally, she stated he would always pull himself out of her before ejaculating and "spray it" on her. Christina said she did not *Page 26 
like it when Jordan did this and told him so, but she did not feel she should "breakup over it." She denied ever having sexual relations with Jordan in AP's room or on the rug from AP's room.
 {¶ 131} Finally, Christina spoke about the previous allegations involving AP and Jordan. She said that her former husband alleged that Jordan was sexually abusing AP, but that AP denied those allegations. She also testified that allegations of physical abuse had been dismissed.
 {¶ 132} AP was the State's final witness. She confirmed that she lived with Jordan and that he dropped her off at KW's at about 9:30 on March 28th. She said that CA was at her house when she woke up, but did not come with her to KW's that morning because her dad was supposed to pick her up that morning. CA arrived at KW's later, at about 3:30. At that time, CA smelled like alcohol, "looked like really depressed," and said she had been sexually assaulted. After CA arrived at KW's, she and AP left to go to Woodard's to get a cigarette. AP testified that Woodard was her boyfriend.
 {¶ 133} AP testified that Jordan had sexually assaulted her three times. The first time, he had her drink flavored vodka and played a pornographic movie. Jordan then removed AP's pants and performed cunnilingus on her, then made her perform fellatio on him. Finally, he had sexual intercourse with her while she was on her knees and he was behind her. These acts occurred in the family's living room. The second time, they performed these same acts in her bedroom. This time, he ejaculated on AP's face and some got on her rug. The third incident happened in Jordan's truck. AP testified that Jordan made her perform fellatio on him and that she vomited when she was done. She described his genitalia as "about eight inches."
 {¶ 134} AP testified that she performed these acts because she was afraid that Jordan would punish her as he had done in the past. She also did not think her mother would believe her if she had told her what had happened. She said that she treated Jordan as a stepfather and that he treated her as a stepdaughter.
 {¶ 135} AP admitted that she smoked marijuana on a regular basis, "about every weekend," and that she did this with Woodard. She acknowledged that her mother had *Page 27 
told her she was not to see Woodard. She said that Jordan started her habit of smoking marijuana and that she had purchased marijuana for him in the past.
 {¶ 136} AP testified about the previous domestic violence charge involving her and Jordan. She said that he picked her up by the throat when yelling at her. However, she eventually asked that the case be dismissed because "my mom was upset and I didn't want him to get into trouble." She recalled that Jordan's version of events was that he slapped her.
 {¶ 137} AP also testified about the sexual abuse allegations her father made with regard to Jordan. She said that the complaint was based on Jordan touching her the wrong way. AP told Carrothers, who investigated that claim, that these touches were accidental.
 {¶ 138} Finally, AP testified about an incident that happened after Jordan's arrest. Two girls came to AP's home and told her that Woodard wanted to meet her at a bridge. The girls asked her about what Jordan did and asked her if she had lied about it. AP told them that she "wouldn't lie about something like that." While speaking to these girls, she saw a video camera in the area.
 {¶ 139} The first witness for the defense was Laken Jordan, Jordan's sister-in-law. She testified that Jordan was at her house at about 10:00 on March 28th with the baby and stayed until about 11:30. When Jordan left, he forgot the diaper bag, so Laken brought it to his home at about 1:30. She did not see anyone but Jordan and the baby at the house at this time. Laken testified that Jordan's demeanor at each of these times was "normal like he usually is," that he did not seem anxious, and that nothing seemed out of the ordinary. When Laken left the house, Jordan left as well with the baby to take a lunch box to Christina's son.
 {¶ 140} Laken also testified that she had asked two of her sister's friends to talk to AP while she videotaped the exchange. The plan was to have AP confess that the charges against Jordan were fabrications. However, the audio on the tape did not work. She denied ever seeing Jordan smoke marijuana.
 {¶ 141} One of the girls involved in the videotape incident, Ashley Chiadi, *Page 28 
confirmed that Laken had asked her and another girl to speak with AP. Chiadi testified that AP said, "the thing with Eric didn't happen," but didn't mention the word rape. Kayla Williamson, the other girl involved, also testified that AP said "the Eric thing * * * didn't happen." She also stated that AP said the word "rape" and that AP raised the subject herself.
 {¶ 142} Laken's best friend, AP DiLoreto, confirmed that she saw Jordan with the baby at Laken's house at 11:30 on March 28th and that nothing seemed out of the ordinary. She was also present at his house with Laken at about 1:30. She said no one else was present and that Jordan left when they did.
 {¶ 143} Nick Jordan, Jordan's brother, testified that he was at Jordan's house often. On a couple of occasions, he caught Jordan and Christina in the act of sexual congress. On one of those occasions, Nick found Jordan and Christina engaging in sexual intercourse in AP's bedroom. On other occasions, Nick could hear Jordan and Christina engaging in sexual relations upstairs in AP's bedroom while he watched the baby. Nick also stated that he had seen Jordan discipline AP for having cigarettes and marijuana in her room. Nick had never seen Jordan smoking marijuana.
 {¶ 144} The defense's last witness was Jordan himself. He testified that he left with AP to go to KW's house at about 9:00. He stopped by a title company to see about the transfer of the real estate, but there was a sign on the door saying they would be back in one hour. He then drove to his brother's house and arrived there sometime around 10:00. He stayed there until about 11:30 when he took the baby home so it could be fed. As he was leaving, he greeted DiLoreto, who was walking into Laken's home. After he arrived home, he cut himself on a nail that had been sticking out.
 {¶ 145} At about 12:30, CA knocked on the door and wanted a ride to KW's home. Jordan testified that CA looked normal and happy and said she had a good time with her dad. Jordan testified that they left at about 12:45 and that he dropped her off at about 1:00. He said he arrived home at about 1:15 and that Laken and DiLoreto arrived soon after to deliver the diaper bag. Christina's son then called about his lunch box, so Jordan left with the baby at about 2:00 to take the lunch box to him. After that, he drove *Page 29 
to Christina's work to see if the dentist she worked for could stitch his wound. After finding out he could not, Christina suggested that he take the baby to Everhart while he was at the hospital. He arrived at Everhart's at about 2:45 and dropped the baby off. He then left to go to the hospital.
 {¶ 146} On the way to the hospital, he saw AP and CA and stopped his truck. He heard the girls speak about subjects he thought were inappropriate and asked them where they were coming from. They said they had been at Woodard's. AP admitted that she had been smoking marijuana at Woodard's home and he found marijuana in her purse. He told them to go back to KW's and that they would be in trouble. Jordan then went to the hospital, where he was treated for his injury. He then picked up the girls and brought them home. He told the girls he would not tell anyone that night; instead, he gave the girls a chance to confess themselves first and would wait until Wednesday night to tell their mothers. At his police interview after his arrest, he stated he denied the allegations and said, "Look, if I'm lying please prove it."
 {¶ 147} Jordan testified that Christina had bought her son a bottle of Bacardi 151, but stated that Christina's son had taken it to his grandfather's house. Jordan denied using marijuana and denied having AP buy marijuana for him. He believed trace amounts of seminal fluid could have gotten on CA's underwear from contact with his clothing since there were clothes "strewn out all over the floor".
 {¶ 148} Jordan stated that he transferred his home to Christina because they were re-siding the house and needed a loan to get enough siding. Christina said she had better credit, so he should put the house in her name so she could use it as collateral.
 {¶ 149} Jordan said that he and Christina had sexual relations in every part of the house, even upstairs in AP's bedroom and confirmed that his brother had caught him and Christina in flagrante delicto in AP's room. He also confirmed that he would often pull himself out of Christina before he ejaculated. She told him, "She didn't want me, you know, to do that inside her because of the fact that after we got done and then she got dressed it would leak out onto her clothes," and that she preferred he ejaculate on her chest. He admitted that she did not like it when he ejaculated on her face, but stated that *Page 30 
he never did this on purpose.
 {¶ 150} Finally, Jordan spoke about the prior allegations against him regarding AP. He said that AP's father made the allegations of sexual abuse in order to obtain custody of the children. AP told the investigator that Jordan had not acted improperly. As for the domestic violence allegation, he admitted that he became angry when AP called him an "asshole" and said he smacked her across the mouth. AP later recanted her accusation that something more than this happened and the charges were dismissed.
 Offenses Against CA {¶ 151} Jordan was convicted of raping CA under R.C. 2907.02(A)(1)(c) and unlawful sexual conduct with CA, a minor, under R.C. 2907.04(A). Both of these convictions arise from the same incident and the elements of these offenses are described above. However, the critical issue with regard to Jordan's manifest weight argument is not with regard to any particular element. Instead, he contends that CA's testimony is so incredible that his convictions do not attain the high degree of probative force and certainty required of a criminal conviction. We disagree.
 {¶ 152} When looking at the evidence in this case, there were clearly reasons why the jury could have chosen to disbelieve either CA or Jordan's version of events. For instance, Jordan's alibi was provided mainly by witnesses who were biased in his favor. Furthermore, his behavior after the alleged assault was "unusual." Finally, any aspects of the timeline provided by the various unbiased witnesses can easily be explained either by the trauma which CA felt due to the assault or her drunken state at the time of and after the assault.
 {¶ 153} We cannot conclude that the evidence presented does not attain the high degree of probative force and certainty required of a criminal conviction. Accordingly, we must affirm Jordan's convictions for the offenses committed against CA.
 Offenses Against AP {¶ 154} Jordan was convicted of three offenses against AP: 1) rape under R.C. 2907.02(A)(1)(c); 2) rape under R.C. 2907.02(A)(2); and, 3) sexual battery under R.C. 2907.03(A)(5). The elements of these offenses are described above. However, those *Page 31 
individual elements, again, are not important to Jordan's manifest weight argument. Instead, he argues, that AP's testimony was not credible and uncorroborated.
 {¶ 155} The record clearly reveals reasons to doubt AP's testimony. First, her testimony bolsters CA's testimony which, for the reasons stated above, is of doubtful credibility. Second, she had reason to fabricate these charges against Jordan. Third, there was a lack of any physical evidence of sexual assault. Fourth, previous allegations against Jordan had been found to be unsubstantiated. Finally, the two girls who spoke to AP (and who did not know Jordan) testified that AP told them she had fabricated the "thing" with Jordan. Nevertheless, it is easy to reconcile AP's description of the sexual assaults with any other testimony, partially because she was somewhat vague as to when these events actually occurred.
 {¶ 156} "Because the trier of fact sees and hears the witnesses and is particularly competent to decide `whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility." State v. Burgess,162 Ohio App.3d 291, 2005-Ohio-3747, at ¶ 5, quoting State v. Lawson (Aug. 22, 1997), 2d Dist. No. 16288. We cannot conclude that the evidence of AP's alleged incredulity overwhelms the "substantial deference" this court gives to the jury's conclusions. Accordingly, Jordan's manifest weight arguments concerning the convictions with regard to AP are meritless.
 Conclusion {¶ 157} Jordan challenges his convictions in many different ways. However, each of his arguments is meritless. Accordingly, the judgment of the trial court is affirmed.
Donofrio, J., concurs in judgment only.
 Vukovich, J., concurs. *Page 1